## CITY COUNCIL OF DAWSON *v.* DAWSON WATER-WORKS COMPANY.

1. Without the preliminary sanction of a popular vote as required by the constitution, a municipal corporation can not contract for a supply of water, on the credit of the city, for a longer period than one year; and a contract which by its terms is to run for twenty years, each year's supply to be paid for semi-annually from year to year, is operative from year to year so long as neither party renounces or repudiates it. *Cartersville Improvement Co.* v. *Cartersville,* 89 *Ga.* 683; *Cartersville Water Co.* v. *Cartersville,* 89 *Ga.* 689; *Lewis* v. *Lofley,* 92 *Ga.* 804; *Habersham County* v. *Porter Mfg. Co.,* 103 *Ga.* 613, followed and approved. *Spann* v. *Webster County,* 64 *Ga.* 498; *Cabaniss* v. *Hill,* 74 *Ga.* 845, overruled in part.

2. Is it not absolutely essential to the validity of an election held under that provision of the constitution of this State which declares that "No . . municipality . . shall incur any new debt, except for a temporary loan or loans to supply casual deficiencies of revenue, not to exceed one fifth of one per centum of the assessed value of the taxable property therein, without the assent of two thirds of the qualified voters thereof, at an election for that purpose, to be held as may be prescribed by law," that there should be an act of the General Assembly prescribing the manner of such election?

3. The manner of holding such election, where the debt to be incurred is a bonded debt, is prescribed in section 377 et seq. of the Political Code.

4. There is no general law of this State prescribing the manner of holding elections where the debt proposed to be incurred is not a bonded indebtedness; nor is there any local law expressly authorizing the City Council of Dawson to prescribe the method of holding such election.

5. Even if no legislation is necessary to authorize a municipal corporation to hold an election to determine whether a debt other than a bonded indebtedness shall be incurred, an election held pursuant to an ordinance

and notice which does not state the amount of the debt to be incurred will not be sufficient to authorize the execution of a contract incurring an indebtedness.

6. Where one enters with a municipal corporation into a contract which is void because opposed to the constitution and laws of this State and contrary to its settled public policy, complete performance of such contract on the part of such person will not prevent the municipal corporation from pleading its want of power or the illegality of the contract.

7. There is nothing in the decision of this case when it was here before, in conflict with the rulings now made.

8. The City Council of Dawson has a right to make a contract to supply the city with water for one year, provided they have in the treasury of the city a sum sufficient to pay therefor, which may be lawfully appropriated for that purpose, or if such sum can be secured by lawful taxation levied during the year in which the contract is made. While a contract for a longer space of time is illegal, yet where the other parties to such a contract have complied with their part by erecting a plant at great expense in order to furnish the city with water, the city is liable for the amount stipulated in the contract for each year that it received the benefits thereof.

9. The evidence being conflicting as to whether during the year for which compensation is claimed by the water company for water furnished to the city the latter received the benefit to be derived under the contract in such a way as to make it liable to pay the annual rental stipulated therein, the case should have been submitted to a jury under proper instructions, and it was error to direct a verdict for the plaintiff.

SIMMONS, C. J., concurring specially.

Argued October 22, 1898. — Reargued January 30, 31, — Decided March 14, 1899.

Complaint. Before Judge Sheffield. Terrell superior court. May term, 1898.

*M. C. Edwards, J. A. Laing* and *Guerry & Hall*, for plaintiff in error. *Hall & Wimberly* and *J. G. Parks*, contra.

COBB, J. The Dawson Waterworks Company brought suit against the City Council of Dawson, claiming that the defendant was indebted to it in the sum of $2,000 besides interest, for water furnished during the year 1895 for the purpose of protecting the inhabitants of the city against fire. At the trial there was introduced in evidence an extract from the minutes of the city council, of the proceedings at a meeting held on May 10, 1886, which was as follows: "A motion was made and carried, that the question of incurring expense of waterworks be submitted to the citizens of the city, and that notice of an election be run in the Dawson Journal for the time prescribed by law, and that an election be held on said

question on the 11th day of June next, 1886." There were
also in evidence four issues of the Dawson Journal, the official
gazette of the city and county, for the four weeks preceding
June 11, 1886, to wit, the issues of May 13, 20, 27, and June
3, respectively, showing the election notice, which was as fol-
lows: "Election notice. Notice is hereby given that there
will be an election held in the City of Dawson on the 11th day
of June, 1886, to determine whether the City of Dawson shall
incur the expense of waterworks." It was admitted that at
the election held pursuant to this notice more than two thirds
of the qualified voters of the city voted in favor of incurring
the expense of waterworks. It was also admitted that the
value of the taxable property of the city of Dawson in 1886
and each succeeding year was over one million dollars. The
contract relied upon by the plaintiff, which was in the form of
an ordinance appearing in the book of ordinances of the City
of Dawson, was introduced in evidence. The material parts
of this contract are as follows: Section 231 grants to R. L.
Bennett of Philadelphia, Pennsylvania, his associates, their
successors and assigns, who are to organize a company to be
styled the Dawson Waterworks Company, the exclusive right
and privilege for a period of ninety-nine years to construct,
maintain, and operate a system of waterworks for supplying
said city and its inhabitants, and for protection against fire,
and for domestic and sanitary and other purposes. Section
232 grants authority to lay water pipes and mains in the
streets and avenues of said city as the same are now open or
may be extended, to dig ditches and trenches in the streets.
Section 233, right to erect buildings and tanks and lay pipes,
erect other structures, and make improvements on lands owned
and controlled by the city, except public squares. Section
234: The said company, its successors and assigns, to build
and have in operation in eighteen months a complete and
thorough system of waterworks, laying four and eight-tenths
miles of pipe, sizes 8, 6 and 4 inches in diameter, with reser-
voir of not less than 40,000 gallons capacity, and of sufficient
height to produce a pressure on the mains such that from any
hydrant located in the principal streets a stream of water will

be projected fifty feet vertically in still air, through one hundred feet of fire hose with a one-inch nozzle attached.    Said company or assigns, from completion of system of waterworks until their charter shall cease, shall be required to furnish a sufficient supply of water for the purposes before and hereafter mentioned, unless prevented by unavoidable and providential causes.    In such an event they shall be allowed a reasonable time to make repairs, and if, after such reasonable time shall have been allowed, they should still fail to furnish said supply of water, their franchise from that fact shall be forfeited.    Section 235:   The company to extend mains and pipes, and enlarge plant of system generally, to meet increasing demands from growth of city.    Section 236:   The City of Dawson, in consideration of said company guaranteeing to it, for the period of twenty years, and as long thereafter as the said company, its successors and assigns, shall continue to operate the waterworks, a free and unrestricted use of its water in case of fire, and for protection against conflagration, and agreeing to establish at convenient places along the line of its mains fire-plugs of approved patent, not to exceed fifty in all, until the corporate limits of said city are extended and the population of said city increases so that there are five hundred persons living in said extension, after which they shall be increased proportionately if required, and, as an additional fire protection, also to furnish water to fill the present public cisterns if needed, the said water to be used exclusively for fire purposes only, and the said water to remain the property of the said company except in case of fire, obligates itself to pay to the said company, or to such trust company as the Dawson Waterworks Company may elect or decide upon as their trustees for their bonds, the sum of two thousand dollars annually for twenty years, in semi-annual payments of one thousand dollars each, on the first day of January and July of each year, the first payment to be made on such of said days as occur after the completion of said works as provided in section 234 of this ordinance; and in case said city shall not have sufficient funds at any of such times to make said payments, or, for any cause, does not pay said money at times fixed as aforesaid, then in that case war-

rants shall be issued on the city treasurer, in favor of the company, for the amount due.    Section 237: The council shall, and they are hereby required to make provision each year for the payment of two thousand dollars as provided in the foregoing section, by levying a tax sufficient for that purpose upon the taxable property of the city.    Section 238: The company and their successors and assigns is granted the right to make reasonable rates and regulations for the government of private consumers in the use of its water; and to charge such rates for its use as it may from time to time establish; provided the rates charged per annum shall not exceed those named in the schedule attached (which schedule is immaterial).    Section 239: In consideration of said company agreeing to furnish water to the public municipal buildings, and further agreeing to furnish water to two public fountains of one-inch nozzle each, the City of Dawson obligates itself to remit to said company, its successors and assigns, any and all license fees, taxes, dues and charges which may at any time hereafter be levied or assessed by said city against said company or upon the plant of said system.    Section 240: Full assent of the city is given to a charter to be granted by the legislature of the State to said Bennett and his associates, and their successors or assigns, or to be obtained by them under the general incorporation laws of said State, incorporating them into a body politic to be known as the Dawson Waterworks Company, and granting said company the exclusive right to contract, etc., as herein stated.    Section 241 provides that the ordinance shall be mutually binding upon the City of Dawson and R. L. Bennett and associates and the company to be organized, and to have the same force and effect of a contract between the respective parties as if drawn in the form of a contract and signed by the contracting parties.    Date of ordinance, February 21st, 1890.

It was shown that R. L. Bennett and his associates were, subsequently to the execution of the contract, incorporated under the name of the Dawson Waterworks Company.    It was admitted that the only fire which occurred in the city during the year 1895 occurred on the 19th of February.    There was evidence that the city authorities had accepted the works which

were built by the Dawson Waterworks Company; that the. same cost about $40,000; that during the year 1895 the waterworks company had maintained the system in conformity to the contract, and were ready at all times to supply the quantity of water and the pressure required by the contract. It also appeared that, at the fire above referred to, water from the hydrants of the waterworks company was used in extinguishing the fire; and that the mayor and other city officials were present at the fire and assisted in extinguishing the same with the water drawn from the system of the waterworks company. It was shown that in December, 1894, the city authorities passed a resolution declaring their intention to abandon the contract, and that notice of such intention was given to the company. There was also evidence offered from which it might be inferred that during the year 1895 the city maintained a fire department as it had existed in former years, and that it was the duty of the officers and members of such department to attend all fires and use appliances placed in their hands by the city to extinguish the same; and that without the water furnished by the waterworks company such fire department would be useless. There was, however, evidence that some of the officers of the city understood that they had no authority to use during the year 1895 the water furnished by the waterworks company to extinguish fires. Different members of the fire companies recognized by the city were called as witnesses, some testifying to the effect that they had never received any information as to a change in their status toward the city, or in their duties in reference to fires which might occur during the year in question and their right to use the water of the waterworks company. It was contended by the defendants that the efforts of the city officials to extinguish the fire on the occasion above referred to were purely voluntary, and not in any way intended by them as a recognition of an existing contract between the city and the waterworks company. The court directed the jury to return a verdict in favor of the plaintiff for the amount sued for, with interest; and the defendants excepted.

1. The present constitution of this State provides that "The debt hereafter incurred by any county, municipal corporation,

or political division of this State, except as in this constitution provided for, shall not exceed seven per centum of the assessed value of all the taxable property therein, and no such county, municipality, or division shall incur any new debt, except for a temporary loan or loans to supply casual deficiencies of revenue, not to exceed one fifth of one per centum of the assessed value of taxable property therein, without the assent of two thirds of the qualified voters thereof, at an election for that purpose, to be held as may be prescribed by law; but any city, the debt of which does not exceed seven per centum of the assessed value of the taxable property at the time of the adoption of this constitution, may be authorized by law to increase, at any time, the amount of said debt, three per centum upon such assessed valuation." Civil Code, § 5893. The contract in the present case provides for annual payments of specified amounts to continue during a period of twenty years; and the question arises: Is such a contract the incurring by the city authorities of a debt within the meaning of the clause of the constitution above quoted, so as to render the contract invalid unless the same shall have been sanctioned by a vote of two thirds of the qualified voters of the city at an election held for that purpose? In the cases of *Ford* v. *Cartersville*, 84 *Ga.* 213, and *Lott* v. *Waycross*, Ibid. 681, a similar question was raised, but not decided by this court, because the facts of those cases did not require an adjudication of the question. The same question arose in the case of *Cartersville Improvement Company* v. *Cartersville*, 89 *Ga.* 683, and was then decided, it being there held that, "Without the preliminary sanction of a popular vote, as required by the constitution, a municipal corporation can not contract for a supply of gas on the credit of the city for a longer period than one year; and a contract which by its terms is to run for twenty years, each year's supply to be paid for quarterly during the year, is operative from year to year only so long as neither of the parties renounces or repudiates it." This ruling was followed in the case of *Cartersville Waterworks Co.* v. *Cartersville*, 89 *Ga.* 689.

The present case having been ordered by the court to be reargued, upon the second argument permission was given to counsel

to review all decisions which have been rendered by this court on the question as to what was meant by the word *debt* in the clause of the constitution above quoted. Under this permission the decisions specially brought under review are *Spann* v. *Webster County*, 64 *Ga.* 498, *Cabaniss* v. *Hill*, 74 *Ga.* 845, *Cartersville Improvement Co.* v. *Cartersville*, 89 *Ga.* 683, *Cartersville Waterworks Co.* v. *Cartersville*, Ibid. 689, *Lewis* v. *Lofley*, 92 *Ga.* 804, and *Habersham County* v. *Porter Mfg. Co.*, 103 *Ga.* 613. We are thus to deal with the question now before us in all aspects as if it were before this court for the first time, no ruling heretofore made being absolutely binding upon us. In order to determine what was the purpose of the framers of the constitution in placing the prohibition contained in the section above quoted upon the various subordinate political divisions of the State, and therefore what they intended to prohibit under the name of debt, it is necessary to take into consideration not only that clause upon which a construction is invoked, but also all the provisions of the constitution relating to the same subject-matter, as well as others relating generally to the matter of public debt. All of these are embraced in article 7 of the constitution (Civil Code, §§ 5882–5905). This article deals with the subject of "finance, taxation, and public debt." The powers of taxation over the whole State which can be exercised by the General Assembly are limited to certain specific purposes—support of government and public institutions, payment of the public debt, suppression of insurrection, repelling of invasion, defense of the State in time of war, and pensions for soldiers and widows of deceased soldiers who served in the Confederate army. The power to delegate to counties the right to levy a tax is restricted so that a county can never be authorized to impose a public burden upon its inhabitants except for education, expense of public buildings and bridges, maintaining and supporting prisoners, payment of jurors and coroners, for litigation, quarantine, roads, expenses of courts, support of paupers, and payment of debts existing at the time of the adoption of the constitution. Even the State itself is prohibited from incurring any debt except to supply casual deficiencies of revenue, to repel invasion, suppress insurrection, defend

itself in time of war, and to pay the public debt existing at the time of the adoption of the constitution. The State can not pledge its credit to any person or corporation, and is not allowed to become a joint owner or stockholder in any company, association, or corporation. The bonded debt of the State can never be increased, except to repel invasion, suppress insurrection, and defend the State in time of war. It is expressly declared that when any public property of the State is sold, the proceeds of the sale shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatsoever so long as the State has any bonded debt. Provision is made for a sinking fund to pay off and retire the bonds of the State which had not matured when the constitution was adopted. In addition to the clause above quoted, in reference to incurring new debts by municipal corporations, the following provisions are to be looked to in determining the question now under consideration: "Any county, municipal corporation, or political division of this State, which shall incur any bonded indebtedness under the provisions of this constitution, shall, at or before the time of so doing, provide for the assessment and collection of an annual tax, sufficient in amount to pay the principal and interest of said debt within thirty years from the date of the incurring of said indebtedness." Civil Code, §5894. "Municipal corporations shall not incur any debt until provision therefor shall have been made by the municipal government." Civil Code, §5897.

We are to determine what was the intention of the framers of the constitution, as well as what was the scheme of government they sought to put into operation so far as it relates to the power of the public authorities to incur debts in behalf of the public. This must be derived from the various provisions of the instrument itself, read in the light of antecedent and concurrent public history. All of those provisions which are material to the question now under consideration have either been quoted or referred to in such a way as that their import can be clearly ascertained. It is not only proper but it is our duty to consider any and all facts and circumstances connected with the public affairs of the State which will throw any light

upon the question of the intention of the framers of the con-
stitution in reference to the matter now under consideration.
It is a matter of public history that at the time that this con-
stitution was framed by the convention and adopted by the
people there was an outstanding public debt which the State
had contracted for various purposes.    There were towns and
cities in the State burdened with debts which had been con-
tracted by the public authorities of these corporations, and the
manifest tendency was rather to the increase of this class of
public burdens than otherwise.    There were political divisions
in the State where the people were so burdened by debts
created by the public authorities that it was clearly apparent
that, unless some check was placed upon the power of the gov-
erning authorities to incur debts, the rates of taxation which
would be required in the future to meet the debts would be
ruinous.    It was also a matter of public history, and it appears
in the constitution, itself, that a few years before the consti-
tution was adopted there had been an attempt to impose upon
the State a debt which had never been legally authorized, and
that the State had, in the exercise of its sovereign authority,
declared that such debt was never owed by the public; and
by an amendment to the then existing constitution the General
Assembly was prohibited from paying the same or any part
thereof.    Taking into review, as the framers of the constitu-
tion did, the condition of the public debt of the State and the
condition of the public debt of the various subordinate polit-
ical divisions of the State, nothing can be plainer than that
the power to create debts, incur liabilities, and impose bur-
dens to be discharged in the future, was liable to be grossly
abused, if the same existed without restrictions, either in the
hands of the General Assembly or the authorities of the subor-
dinate public corporations of the State.    In the light of all of
these facts, what is meant by the various provisions of the con-
stitution we have above referred to?    What was the plan to
be followed in the future in regard to the public debt of the
State itself?    Nothing can be clearer.    The public debt of the
State must not be increased for any purpose except those few
above mentioned.    No new bonds shall ever be issued except for

these purposes, or to take the place of existing bonds that have matured; and the railroads and other property owned by the State, whenever it is deemed best to sell any part of the same, must be used to reduce this bonded debt; the proceeds of the sale, whenever there is a sale, being required to be paid upon the public debt. It is true that the State has plenary power to tax in order to pay the debt, but it is obvious that it was the intention of the makers of the constitution that the taxing power should be so used that this burden should be at some time in the future finally discharged. The State was not to be a perpetual interest-paying debtor. The provisions relating to the proceeds of the sale of public property, and creating the sinking fund, demonstrated that it was intended that there should be a time when the State would be free from debt. Not only was it the intention of the framers of this instrument that this debt should be paid, but it was equally their intention that no new debt should be incurred by the State except for the purposes heretofore referred to. In brief, the State was in debt, and the constitution recognized this fact. The rule laid down for the future was: pay the debt and incur no new obligation. The State must not in the future engage in any work of internal improvement except those of a purely governmental nature. The various departments of government must be supported from year to year by taxation, and only in two instances is the State authorized to incur a debt — the one when it may be necessary to defend itself when attacked either by a foreign enemy from without or a domestic enemy from within, and the other in case it is necessary to make a loan to supply a casual deficiency in the treasury, and the amount of such loan is expressly limited.

It was not contemplated that it would ever be necessary for the State to incur any debt except for these purposes, and therefore the power to create the debt was distinctly taken away by the constitution. In the case of the subordinate public corporations of the State, it was seen that in the future as these corporations grew in population it might be best to permit them to incur debts in some instances rather than to impose upon the people resident therein a heavy burden of tax-

ation for any one year. There are many things which are needed by municipal corporations which the State would never need, and therefore the fact that it would be wisest sometimes for municipal corporations to supply themselves with these needed things by borrowing money was recognized by the framers of the constitution; and they did not entirely deprive these subordinate public corporations of the power to incur debts, but simply prescribed that the debt should be incurred in a given way after the consent of the people had been obtained, and that when incurred it should not exceed a certain percentage upon the assessed value of the taxable property embraced within its limits. The power of a municipality to incur a debt is hedged around with such safeguards that it is not probable that the conditions imposed can be complied with unless it is manifest that the purpose for which the debt is to be incurred is a proper one, and that the amount of the debt is such that the tax required to discharge it would not be unreasonable and burdensome. While these corporations were not deprived entirely of the power to incur debts as is the State, the same controlling idea in reference to indebtedness by the State is apparent in regard to indebtedness by these subordinate corporations, that is, that there is to be no plan by which a debt is to be perpetually carried by counties and cities. Municipal corporations can not incur a debt until they provide for paying the same, and they can not incur a bonded debt unless "at or before the time of so doing" provision is made "for the assessment and collection of an annual tax sufficient in amount to pay the principal and interest of said debt within thirty years from the date of the incurring of said indebtedness." The purpose manifested in the section of the constitution from which the above quotation is taken is that the liability upon the municipal corporation growing out of the incurring of a bonded debt should be met by an accumulation made up of sums taken from the taxpayer in annual instalments. They may postpone the payment of the principal of the debt one year, two years, or even to the limit of thirty years, but no further can they go; and no matter what be the period fixed by the municipality in its discretion in which the

bonds are to be paid, and no matter when the bonds mature within this period, the terms of the constitution are mandatory — there shall be each year levied a tax which shall be sufficient in amount to pay the interest due during the current year, as well as any part of the principal that may mature during that year; and also a sufficient amount in addition to these items to make a sinking fund which by the end of the bond period will be sufficient to discharge the entire principal of the debt. To illustrate, if sixty bonds are issued, one maturing each year during a period of twenty-nine years, and all of the balance maturing at the end of thirty years, there must be a tax levied each year which shall be 'sufficient in amount to pay the interest falling due during the current year on all unmatured bonds, and to pay off the principal of the bond maturing that year, as well as to raise a sum which going into a sinking fund and being added to each year will, with its accumulations under proper management, produce an amount sufficient at the end of the thirty years to pay off the principal and interest of all the bonds falling due at that time. The controlling idea is, that so far as the taxpayer is concerned, he is to contribute his proportion annually, whether it go directly to the creditor, or whether it go into the hands of the public officers to be held in trust for the creditor to be paid to him when the debt matures. As has been said, no municipal corporation can incur a bonded debt except one that is to mature within thirty years from its date, and to be paid off and discharged within that time. It is true, as has been stated, that a municipal corporation may incur a debt other than a bonded debt, and the constitution recognizes that it may do so; but it does not say in terms how long such debt may run, nor that it shall be provided for by annual taxation. But is not this necessarily to be inferred? If the constitution is so precise and particular in its terms in dealing with the subject of bonded indebtedness by a municipal corporation, would it be reasonable to say that the municipal corporations are to have more latitude in incurring debts of less dignity? If the bonded debt — the contract by specialty — the contract under seal — is to be discharged by annual contributions within a fixed period, is

it not necessarily to be presumed that it was intended that the simple contract, the promissory note, and the open account must be provided for in a similar way, and if differing at all in its duration, from the time of contracting to maturity should be less than that allowed for the bonded debt?

The authority of the General Assembly to confer upon municipal corporations the power to tax is restricted, but it exists to the extent that a municipal corporation may be authorized to levy taxes for any purpose which is purely public and municipal in its nature.    That a municipal corporation may exercise the power of taxation for the purpose of providing its inhabitants with water for domestic use, as well as to provide the city with water to protect the inhabitants from fire, is the settled law of this State, and is not questioned in the present case. *Frederick* v. *Augusta*, 5 *Ga.* 561; *Rome* v. *Cabot*, 28 *Ga.* 50; *Wells* v. *Atlanta*, 43 *Ga.* 67.    A supply of water for these purposes may be procured by a municipal corporation either by building itself the works necessary for the purpose or by making a contract with other persons to supply the same.    In *Lott* v. *Waycross*, supra, this court held that a municipal corporation could contract an indebtedness for supplying lights to a town, without submitting the question to a vote of the people.    That case was dealing, it is true, with a contract which was to run for a term of ten years; but all that the court held was, that if the amount stipulated to be paid annually was paid during the year in which the service for which the municipal corporation contracted was performed, no indebtedness was incurred by the town.    Justice Blandford in the opinion in that case says:  "Whether this contract incurs an indebtedness which is required to be submitted to the voters of the town under the constitution, it is not necessary for us now to decide.    It may be that the question may never arise, even under this contract, if the sum stipulated to be paid annually for the supply of lights is paid as it becomes due; and if this is a reasonable expense to be incurred by the city, and we do not see why it is not, then the question will never arise.    Should the city make default of payment, then the question might arise; and it would have to be decided whether this was such a contract as

imposed upon the city an indebtedness such as is contemplated by the constitution to be submitted to the people. 'Sufficient unto the day is the evil thereof.' Let the light shine in Waycross." That case can not be used as an authority to uphold as valid the contract under consideration in the present case, except to the extent that if the waterworks company in any year complies with its contract and furnishes water, and the city uses the water and thus receives the benefit of the contract, it can and ought to pay for the service out of the taxes levied during the year in which the water was used. The only effect of the ruling in that case was, that no debt within the meaning of that term as it is used in the constitution is incurred by a municipal corporation for a current expense of this character, if the liability growing out of the transaction can be discharged by the payment of money raised by taxation during the current year.

The word "debt" is defined in various ways. According to the Standard Dictionary, it is "That which one owes to another. Any money, goods, or service that one is bound to pay to another; a pecuniary due." "A thing owed; obligation; liability." Webster's Dic. "A liquidated demand. A sum of money due by certain and express agreement." Anderson's Law Dic.; 3 Black. Com. 154. " All that is due a man under any form of obligation or promise." Bouvier. From the foregoing definitions it is apparent that the word, when taken in a broad and comprehensive sense, includes any obligation that one is under to another to pay money or other thing of value, and arises the very moment that the obligation is undertaken, and continues until discharged by payment. Therefore, in this broad and comprehensive sense, if any time elapses between the performance of the service on the one hand, and the payment of the money or thing of value which the contract for that service calls for on the other, the relation of the parties to each other will be that of debtor and creditor, and the thing which is owed by one to the other will be a debt. If the word debt is to be given this meaning in the clause of the constitution now under consideration, then no officer of any public corporation is authorized to purchase for the public any

article, no matter how small and trifling, unless payment for the same is made in cash at the time the article is delivered; and no article of necessity in the administration of the various public offices in counties and cities in this State can be ordered to be paid for at any time in the future, no matter how short the time may be between the order for the goods and the delivery of the same. Was it the intention of the framers of the constitution that this strict construction should be given to the words that they have used? It is a matter of public history that, from the very organization of the first subordinate public corporation in this State, the sums necessary to pay the expenses incident to the administration of public business were raised by taxation levied from year to year upon the person and property of the inhabitants. Public burdens of every nature were divided into annual sums and were discharged by annual taxes collected for the purpose. Almost without exception this was and has been the rule, not only in regard to the subordinate public corporations of the State, but in regard to the State itself. As a general rule, public officers are compensated by sums which are paid annually; in other words, it is now and has always been the rule that salaries and all expenses of government are paid by the year out of taxes raised during the year in which the service to be compensated was rendered. The constitution was framed and adopted in the light of this fact; and it is not to be presumed that it was intended by the use of the word "debt" that an interpretation should be placed upon it which would have the effect of entirely revolutionizing the practice of nearly a century in relation to the way in which public expenses were incurred and discharged. Especially would this meaning not be given to the word when the constitution itself, in one of the clauses above quoted, not only expressly recognizes that this is the method of dealing with matters of public expense and public debt, but directly declares that that shall be the rule to be followed as to one class of debts which it authorizes municipal corporations to incur. Debt, therefore, as used in the constitution, is to be understood as a liability which is undertaken and which must be discharged at some

time in the future, but which is not to be discharged by a tax levied within the year in which the liability is undertaken. The purpose of the framers of the constitution was to prevent an accumulation of liabilities upon municipal corporations which could be enforced against such corporations in the future by the compulsory levy of taxes. The policy of the constitution is not only against the incurring of liabilities to be discharged in the future for services rendered concurrently with the liability incurred, or previous thereto, but it is equally against the incurring of a liability which is to be discharged in the future, notwithstanding that it depends upon the performance of some service to be rendered in the future. If the character of the undertaking is such that he who deals with a municipal corporation can, under the contract, in the future, of his own volition, and without the consent and over the protest of the authorities of the municipality, place upon it a liability which must be discharged by the levy of a tax in the future, such an undertaking creates a debt within the meaning of the constitution of this State, and one of the very classes of debts which the constitutional provision was made to guard against. If the authorities of a municipal corporation of this State are to be allowed to anticipate far into the future the needs and expenses during each year and to fix in advance an amount that shall be paid for current expenses, and make a contract under which the other contracting party has a right from year to year by a simple performance to put himself in a position where he can demand of the authorities a discharge of the obligation, then it seems to us that the framers of the constitution have done only a vain and idle thing in placing in the fundamental law of the land the clause now under consideration.

Apart from the policy of allowing the authorities of municipal corporations to anticipate what should be incurred as a current expense, ten, fifteen, or twenty years in the future, we can not bring our minds to the conclusion that such an undertaking was ever intended to be authorized by the framers of the constitution. Nay, more, we are convinced that just such undertakings, the consequences of which are just as disastrous as those obligations under which a present liability is incurred,

were in contemplation by the framers of the constitution and intended to be prohibited by this provision. Taking into consideration all of the provisions of the constitution which deal with this subject of debts to be incurred by the public, and taking into consideration the matters of public history above referred to, we are brought to these conclusions as to what was the intention of the framers of the constitution in the matter of debts to be incurred by municipal corporations: (1) The word debt is not to be construed in its broad and unrestricted sense, of a liability by one person to pay money or other thing of value to another. (2) A liability for a current expense can be incurred by a municipal corporation for any one year, provided there is, at the time of incurring the liability, a sufficient sum in the treasury of the city which may lawfully be appropriated to the payment of the liability incurred, or if a sufficient sum to discharge the liability can be raised by taxation during the current year; and such a transaction would not create a debt within the meaning of that word as it is used in the constitution. (3) It was the purpose of the constitution to provide a system of finance for subordinate public corporations, under which there should be each year contracts made for the expenses of the year, and these were to be paid out of moneys arising from taxes levied during the year, that is, that each year's expense should be paid by taxes levied during the year, and no item of expense was to be paid except out of the taxes levied during the year in which the contract for such expense was made. (4) Any liability which was not to be discharged by money already in the treasury, or by taxes to be levied during the year in which the contract under which the liability arose was made, is a debt within the meaning of the constitution, and can not be incurred without the preliminary sanction of a popular vote, unless it be for a temporary loan to supply casual deficiencies of revenue. If we are correct in these conclusions, then the contract under consideration in the present case created a debt within the meaning of the constitution, the aggregate amount of which was the sum of the annual rentals therein stipulated to be paid; and it is therefore illegal and not binding, except for the first year in which the

contract was entered into, and for any subsequent years in which the municipality sees proper to receive at the hands of the waterworks company the benefit which the city might derive from the contract.

Counsel for defendant in error earnestly insisted that it was determined by the Supreme Court of the United States in the case of Walla Walla *v.* Walla Walla Water Company, 172 U. S. 1, 19 Sup. Ct. Rep. 77, that contracts of this character did not create debts, and that this decision was so well supported by reason, as well as by the current of American authority, that we should follow the same, although it was upon a question on which the decisions of that court are not binding upon this court.   Notwithstanding the great respect we have for the decisions of that court, we are constrained to disagree with it in the conclusions reached in the case referred to.   We can not, without doing violence to what we believe to be the manifest intention of the framers of the constitution, follow the rulings made by that court and other courts of respectable standing throughout the Union.   That the ruling which we make in the present case is in direct conflict with a decision of the highest court in the land, as well as with the current of American authority on the subject, is the best evidence that can be offered to show how strong our convictions must be as to what was intended by the framers of the constitution as we gather it from the instrument itself and the matters of public history of this State which are alluded to above.   In the case above referred to the court had under consideration a contract very similar to the one involved in the present case, made by the city of Walla Walla with a water company.   The charter of the city provided that "the limit of the indebtedness of the city of Walla Walla is hereby fixed at $50,000."   The court came to the conclusion that the aggregate amount to become due under the contract was not to be added to the existing indebtedness of the city in determining whether the charter limit of indebtedness had been reached, and that there was no indebtedness under the contract until the services therein provided for had been actually rendered.   Mr. Justice Brown in the opinion says: "There is a considerable conflict of authority respecting the proper con-

struction of such limitations in municipal charters. There can be no doubt that if the city proposed to purchase outright, or establish a system of waterworks of its own, the section would apply, though bonds were issued therefor, made payable in the future. [Citing authorities.] There are also a number of respectable authorities to the effect that the limitation covers a case where the city agrees to pay a certain sum per annum, if the aggregate amount payable under such agreement exceeds the amount limited by the charter. . . But we think the weight of authority, as well as of reason, favors the more liberal construction, that a municipal corporation may contract for a supply of water or gas, or a like necessary, and may stipulate for the payment of an annual rental for the gas or water furnished each year, notwithstanding the aggregate of its rentals during the life of the contract may exceed the amount of the indebtedness limited by the charter. There is a distinction between a debt and a contract for a future indebtedness to be incurred, provided the contracting party perform the agreement out of which the debt may arise. There is also a distinction between the latter case and one where an absolute debt is created at once, as by the issue of railway bonds, or for the erection of a public improvement, though such debt be payable in the future by instalments. In the one case the indebtedness is not created until the consideration has been furnished; in the other the debt is created at once, the time of payment being only postponed. In the case under consideration the annual rental did not become an indebtedness, within the meaning of the charter, until the water appropriate to that year had been furnished. If the company had failed to furnish it, the rental would not have been payable at all; and, while the original contract provided for the creation of an indebtedness, it was only upon condition that the company performed its own obligation. . . A different construction might be disastrous to the interests of the city, since it is obviously debarred from purchasing or establishing a plant of its own, exceeding in value the limited amount, and is forced to contract with some company which is willing to incur the large expense necessary in erecting waterworks upon the faith of the city paying its an-

nual rentals.    [Citing authorities.]    The obvious purpose of limitations of this kind in municipal charters is to prevent the improvident contracting of debts for other than the ordinary current expenses of the municipality.    It certainly has no reference to debts incurred for the salaries of municipal officers, members of the fire and police departments, school-teachers, or other salaried employees, to whom the city necessarily becomes indebted in the ordinary conduct of municipal affairs, and for the discharge of which money is annually raised by taxation. For all purposes necessary to the exercise of their corporate powers they are at liberty to make contracts, regardless of the statutory limitation, provided, at least, that the amount to be raised each year does not exceed the indebtedness allowed by the charter.    Among these purposes is the prevention of fires, the purchase of fire-engines, the pay of firemen, and the supply of water by the payment of annual rentals therefor."    The learned Justice in the opinion cites the case of *Lott* v. *Waycross*, supra, as one of the authorities to sustain his position.    He has entirely misconceived the scope of that decision.    The question dealt with by him is expressly left open and undecided.

Upon two propositions we are compelled to take issue with the learned Justice who delivered the opinion.    First, we can not agree that there is such a distinction between a debt and a contract for a future indebtedness to be incurred, provided the contracting party perform the agreement out of which the debt may arise, as that a municipal corporation may make a contract of the latter character, when it is expressly prohibited from creating a debt.    In the consequences resulting, in the effect upon the taxpayers, and in every way that either may be productive of harm, the two are identical.    In each a liability is incurred, and the party contracting with the city, no matter what we may call him — creditor or contracting party in an agreement for future indebtedness — has, by the simple performance on his part of some act provided for in the agreement, the right to use the strong arm of the law to compel the city to pay him therefor.    A city thus situated is under an obligation that it can not throw off; has upon it the weight of a burden that it is bound to carry; is powerless to defeat, if it is

desired to do so, the claim of him with whom it has contracted;
is in debt, and no argument founded upon sound reason can
ever make it otherwise. Second, we can not agree that the ob-
vious purpose of limitations of this character is to prevent the
improvident contracting of debts for other than the ordinary
current expenses of the municipality. It seems to us clear from
what we have stated, that the almost expressly avowed purpose
of the framers of the constitution was not only to prevent the im-
provident contracting of debts for other than the ordinary cur-
rent expenses, but also to prevent the improvident contracting
of debts for all purposes, whether for current expenses or other-
wise, except by the sanction of a popular vote, unless for some
reason there should be during the year a deficiency in the reve-
nue raised for the purpose of paying the current expenses of
the municipality. If contracts of the kind now under consid-
eration are to be allowed on the ground that they are for cur-
rent expenses, then it would seem that there was no reason
for that provision in the section which authorizes a temporary
loan to supply a casual deficiency. The power to make a
temporary loan for a casual deficiency, being expressly conferred,
but emphasizes the fact that the constitutional plan was that
there should be a balancing of accounts at stated periods of
time, at the end of the calendar year or the fiscal year of the
corporation, when the amounts raised by taxation on the one
hand should be applied to the sums incurred as expenses on
the other; and if, during the period in which the expense
was incurred and the tax was levied, by some oversight the
levy was not of sufficient amount to pay the expenses, the de-
ficiency, casual in its nature, which was contemplated by the
constitution, arose and could be supplied by a temporary loan.
The period marked by the calendar year or an arbitrary fiscal
year was evidently in contemplation by the framers of the con-
stitution, as that is in accord with the custom so long existing
in this State.

The conclusion reached by the Supreme Court of the United
States in the Walla Walla case seems to be sustained by the
decisions in the following cases: Grant *v.* Davenport, 36 Iowa,
396; Budd *v.* Budd, 59 Fed. 735; City of Valparaiso *v.* Gard-

ner (Ind.), 49 Am. Rep. 416; Raton Waterworks Co. *v.* Raton (N. M.), 49 Pac. 898; Creston Waterworks Co. *v.* Creston (Iowa), 70 N. W. 739; Wade *v.* Borough of Oakmont (Pa.), 30 Atl. 959; Utica Waterworks Co. *v.* City of Utica, 31 Hun, 426; Woods *v.* City of Oklahoma, 2 Okl. 158; Dively *v.* Cedar Falls, 27 Iowa, 227; Dwyer *v.* City of Brenhan, 65 Tex. 526; Lamar Water Co. *v.* Lamar, 128 Mo. 188; Weston *v.* Syracuse, 17 N. Y. 110; Stedman *v.* City of Berlin (Wis.), 73 N. W. 57; New Orleans Gas Light Co. *v.* New Orleans (La.), 7 So. 559; City of East St. Louis *v.* Gas Light & Coke Co., 98 Ill. 415; McBean *v.* City of Fresno, 112 Cal. 159; Smith *v.* Dedham, 144 Mass. 177; Seitzinger *v.* Tamaqua (Pa.), 41 Atl. 454. In the following cases the conclusion reached seems to sustain the ruling made in the present case: Appeal of the City of Erie, 91 Pa. St. 398; Humphreys *v.* City of Bayonne (N. J.), 26 Atl. 81; Niles Waterworks *v.* City of Niles (Mich.), 26 N. W. 525; Salem Water Company *v.* City of Salem, 5 Or. 29. In none of the cases was the constitutional or charter provision in which the word "debt" was used exactly identical with the words of our constitution, but in some of them there is no material difference, and this is true of a greater number of the cases cited on each side of the question. Believing that no other conclusion would carry into effect the constitution as its framers intended, we have nothing to do with the argument that the result reached by us may be disastrous to municipal corporations desiring to make public improvements. We do not believe, however, that the consequences will ever be so disastrous as seems to be anticipated by counsel in the present case or by Justices in decisions in cases where a contrary view to that expressed by us is taken. So far as we are concerned, we are satisfied with the policy of the constitution, which, as we believe, demands annual adjustments of municipal expenses and municipal taxes, with the requirement that the expenses each year shall be discharged by the taxes of that year, save only in the two cases provided for in the constitution — consent of the inhabitants of the municipality, and a casual deficiency in the revenue.

All of the cases heretofore decided by this court, in which the matter now under consideration was directly dealt with,

will now be considered in the light of what we have said, and attention will be directed to the effect, of the ruling made in the present case, whatever it may be, upon each of the rulings heretofore made by this court.    The first case on this question that came before this court after the adoption of the constitution of 1877 seems to have been *Hudson* v. *Marietta*, 64 *Ga.* 286.    Only two Justices participated in this decision, and therefore, if it is in conflict with the views now entertained by us, it need not be formally overruled.    All that is in this case that bears at all upon the question now under consideration is the language of Chief Justice Jackson, quoted in another part of this opinion, as to the intention of the framers of the constitution; and his views therein expressed seem to be entirely in accord with those now entertained by us.

In *Spann* v. *Webster County*, 64 *Ga.* 498, it was held that under the constitution of 1877 a county could not levy a tax "to buy a safe, without the assent of two thirds of the voters at an election held for that purpose."    Justice Jackson in the opinion says: "The levy of twenty-two per centum for iron safes is not mentioned in the purposes enumerated in the second paragraph of the sixth section and seventh article; nor are there words therein which, without much latitude of construction, can be construed to authorize the tax.    Besides, the purchase of these safes is the creation of a new debt since the adoption of the constitution of 1877, and expressly prohibited by the first paragraph of the seventh section of article seven, 'without the assent of two thirds of the qualified voters of the county at an election for that purpose, to be held as may be prescribed by law.'    No such election has been held, and a new debt, without its sanction as a condition precedent, can not be imposed. . . It was the purpose of the framers of that constitution to tap the root of that system of indebtedness by counties, cities and towns, which was growing into immense proportions and spreading mildew and blight everywhere over the land; and it is made our duty by the same constitution to declare all laws in violation of its provisions and prohibitions to be null and void. . . These safes might have been bought on a credit and a debt incurred therefor prior to this constitution, Code, §§ 497–

502; and they may be bought still, if the county should have surplus funds from any source to pay cash for them, Code, § 528; or if the debt be incurred with the assent of two thirds of the voters of the county, but not otherwise." So far as that case may be authority for the position that a contract for the purchase of articles of the nature therein dealt with will not be lawful, notwithstanding there has been, or may be, during the current year in which the contract of purchase is made, a tax levied which will realize a sufficient amount which can be lawfully appropriated to discharge the obligation, the same is overruled, as being in conflict with the views hereinbefore presented.

In *Mayor of Rome* v. *McWilliams*, 67 *Ga.* 106, it was held by two Justices that, "Where a tax has been levied by a municipal corporation, sufficient to cover an anticipated expenditure for city offices or the like, it is not necessary to delay taking any steps towards securing such improvements until the money is actually in the treasury. To have work done and pay for it at its completion, or by instalments during its progress, having the money ready when the time of payment arrives, is not to incur a debt within the meaning of the constitutional prohibition on that subject." In the opinion Justice Speer uses this language: "An obligation arising under a contract on the part of a municipal corporation to pay for work when and as it shall be performed *in the future*, does not constitute or ripen into an indebtedness within the meaning of the constitution till at least the performance of the work . . . If this were not so, then it would be impossible, in a majority of instances, to even contract for the most necessary public building without a prior levy and deposit of money in the treasury. The obligation to pay, so far as the *time* of its inception as between the parties is concerned, is one thing, and an actual *indebtedness* within the meaning of the constitution is another. I may enter into a contract for an architect to build me a house, but if he never does the work I owe him nothing; so if I pay him as he progresses, I will not be his debtor; so if I contract to pay him when the work is done, I owe him nothing till the contract is fulfilled, and if on its fulfilment I discharge it, I can not be said to have incurred a debt in the sense the con-

stitution prohibits corporations from incurring." Chief Justice Jackson in a concurring opinion distinguishes this case from *Hudson* v. *Marietta*, and *Spann* v. *Webster County*, supra, and in reference to the latter case he uses this language: "It is true that in the county case in delivering the opinion I do also invoke the other clause of the constitution, and use expressions going to show that something like this—iron safes—to be paid for by taxes, is a debt in the sense of the constitution, but I say there that if the county had money legitimately drawn from other sources, it could pay for the safe. In this case this money will be in the treasury, legitimately put there by taxation for current and ordinary expenses—the prime necessity of a municipal government, a city hall and appurtenances; and I think that the constitutional prohibition against new debts does not cover such a case." Justice Crawford in his dissenting opinion, after referring to the constitutional provision under consideration, says: "It is admitted that *a new debt* could not be *incurred* except as above provided. Then the question is, whether a city can levy a tax with which to pay a *future* liability that it could not legally incur. If the right exists to make the contract, *the time when* the payment is to be made is wholly immaterial; it neither enlarges the power nor changes the nature of the liability. It is the incurring of a new debt, whether paid when the work is done, or five years thereafter; it is a debt from the making the bargain until paid, be that when it may. To say that for *a new debt* to be incurred with which to build a town hall, without first submitting it to the people, would be *unconstitutional*, and to say that the levy of a tax to build a town hall without submitting *that* to the people would be *constitutional*, does not seem to me to be either law or logic. This provision in the constitution was to give the taxpayers the right to say whether the *expenditure* should be made, and to require their assent before the taxes should be laid for such expenditure." Some of the language of Justice Speer is in direct conflict with the views now entertained by us, and we decline to follow his reasoning. Taking the case in the light of the concurring opinion of the Chief Justice, the judgment in that case does not con-

flict with the ruling now made.    The views entertained by the dissenting Justice go much farther in the line of strict construction than we are prepared to go.

While no ruling was made directly on the question now before us, in *Walsh* v. *Augusta,* 67 *Ga.* 293, the clause of the constitution with which we are now dealing was under consideration, and it may not be inappropriate to quote here some of the language of Chief Justice Jackson, where he calls attention to the evil which was intended to be remedied by the clause of the constitution now under consideration.    After referring to the law in relation to such matters as it existed before the adoption of the constitution, he says: "What was the evil? It was the evil attendant upon all people who handle money not their own.    The cities of the State incurred a very heavy indebtedness—some of them became insolvent.    To levy taxes enough to pay them would work the ruin of the citizens and blight the prosperity of the city.    Not to levy and pay them would be to destroy credit and soil honor.    The cities are the arteries of the body politic.    With them destroyed or sluggish, the heart, the very life of the republic, would cease to beat, or pulsate with a feeble supply of vital fluid.    So that in their health is involved that of the entire commonwealth, and to suffer their honor to be tarnished is to soil that of the State. Therefore the strong language used by this court in 64 *Ga.* 286 and 498, in respect to the evils resulting from this unlimited power to incur city indebtedness with only the slight check of the sanction of a majority of the voters, without regard to their property or intelligence, is sober though figurative—it is stern truth and no flight of fancy.    One of the largest cities of a sister State actually surrendered her franchises and ceased to be corporate, because of the extravagant debts her authorities had incurred, and her total inability to meet them ; and one of our own was almost in the throes of death because of the burden under which she staggered.    To stop this tide of evil, which always swells in the calm of prosperity and peace, rather than in the storm of adverse weather when all eyes are watching the danger, the framers of the constitution of 1877 inserted this paragraph and the succeeding

paragraph of this section; and reading them in the light of the old constitution, the mischief and the remedy, we think the meaning will become apparent, despite the confusion which arises from the inaccurate use of the words. The framers of it could not extinguish past indebtedness of cities. The constitution of the United States prohibited their doing so, because the obligation of contracts would be destroyed. But they did everything else which they had power to do to stay this tide and keep Georgia above its flood. They prohibited all cities from making any new debt, unless sanctioned by two thirds, instead of a majority, of the voters, except small loans to supply casual deficiencies of revenue, not to exceed one fifth of one per centum upon the taxable property thereof. They, then, even with this sanction of two thirds of the citizens to a new debt, required a provision for the payment of this debt by the assessment and collection of an annual tax sufficient to pay the principal and interest of the debt within thirty years. . . Thus determined to preserve the honor and credit of the State by preserving that of her minor governments, the framers of the constitution of 1877 inserted these checks on new debts of cities. First, two thirds must vote them, and secondly, preparation must be made by taxation to pay them, and the voter, when he deposits his ballot, must know that he puts no burden on posterity which he will not assume himself, but every year he must pay his quota for interest and a sinking fund for principal to be levied and collected on his property."

In *Pennington* v. *Gammon*, 67 *Ga.* 456, it was held that a county may organize a chain-gang, to be composed of convicts to work on the public roads, streets, or other public works, and that provision may be made for their safe-keeping and employment, and that if when engaged in a work of this character there should arise a necessity to purchase tools and implements necessary for the work, the county could, when too late to levy a tax for this purpose, incur a debt, this being a casual deficiency in the revenue, within the meaning of that expression as it is used in the constitution, the amount of such debt, however, not to exceed the limit fixed by the constitution, that is, one fifth of one per centum upon the assessed value of the

taxable property of the county. There is nothing in this decision which conflicts with what we now rule, but it seems to be in line with the argument which we have pursued. In *Butts* v. *Little*, 68 *Ga.* 272, it was held that a contract by a county for the erection of a building at a specified price, to be completed by a given date, and payment to be made as the work progressed, was, in effect, a contract to pay the price agreed on by the date of completion fixed; and that where the amount of such price was more than could be lawfully raised by taxation, a debt was incurred within the meaning of the constitution, and the contract was invalid because it had not been authorized by a popular vote in the manner prescribed by the constitution. While the contract under consideration in that case was thus declared to be void, the judgment was reversed on terms; the effect of the decision being to authorize the making of a contract which would provide that the cost of the building as it fell due should be met annually by the levy of one fifth of one per centum on the assessed value of the taxable property of the county. This part of the decision seems to be based upon the idea that a county would have a right to anticipate a casual deficiency in the revenue which might arise in future years. It is not necessary to refer further to this decision, as anything said therein which is in conflict with the present decision was overruled in *Lewis* v. *Lofley*, infra. In *Cabaniss* v. *Hill*, 74 *Ga.* 845, the ruling made in the case of *Spann* v. *Webster County*, supra, was followed, and in the opinion Chief Justice Jackson, after a ruling to that effect, in referring to the particular facts of the case then under consideration, says: "But even if this contract does not create a debt, these orders were made payable only out of the proceeds of taxes for the new jail in the year 1884. So far as they show an acceptance of the work of the movants—a promise to pay the price fixed by contract if the work were satisfactory,—these orders are on the treasurer, not to be paid out of any general fund or future levy of taxes, but out of a tax already levied for the jail into which the work was to go and of which it was to become a part; and it may be that this provision in the orders, as payable out of money in sight, already provided for, might be construed into a sort of

. cash arrangement, and not a debt in the sense of the constitu-
tion. If anything can save it from being a new debt, it is this
arrangement to pay out of funds, not in the treasury it is true,
but on the way to it." It is true it was held in that case that a
county would not be compelled by mandamus to pay the claim,
because the fund upon which the orders were drawn had been
exhausted and there was no fund with which to pay the debt
either in the treasury or on its way thereto. So far as the ruling
in the case is concerned, it is in conflict with the views we now
entertain, and the case must be overruled, for the same reason
that the case upon which the ruling was based is overruled.

In *Conyers* v. *Kirk*, 78 *Ga.* 480, it was held: "A municipal
corporation can make a cash contract for current supplies, such
as lamps and gasoline for lighting the streets, through its ap-
propriate officers or committees, as effectually as by formal order
or resolution entered on its minutes." Chief Justice Bleckley
in the opinion says: "The facts of this case, taken most strongly
in favor of the prevailing party, as they must be after verdict,
do not show any purpose or intention to create a debt. The
debt resulted from a breach of the contract, not from the mak-
ing of it. Against paying a debt so originating, there is no
constitutional impediment. When a cash purchase is made,
there is no expectation that any debt will exist, and there was
no such contemplation in this case. If we take the evidence,
as we do, most favorably for the plaintiffs, there was no inten-
tion that any debt should arise. It was contemplated that pay-
ment should be made as soon as the articles were delivered;
and the reason indicated in the record why payment was not
then in fact made was the accidental absence of the city treas-
urer from his office. So that this debt (and it is a debt now)
became such, not by virtue of making the contract, but by vir-
tue of breaking the contract; and surely there never can be and
never will be any law against paying a debt which arises from
default in making a cash payment at the time the debtor ought
to have made it, the cash sufficient for the purpose being then
in the debtor's treasury." The decision and the reasoning upon
which it is based are not in conflict with what we now rule, but
both tend rather to support our conclusions than otherwise.

In *Cartersville Improvement Company* v. *Cartersville,* 89 *Ga.* 683, the conclusion reached was expressed in a headnote, which is as follows: "Without the preliminary sanction of a popular vote as required by the constitution, a municipal corporation can not contract for a supply of gas on the credit of the city for a longer period than one year; and a contract which by its terms is to run for twenty years, each year's supply to be paid for quarterly during the year; is operative from year to year only so long as neither of the parties renounces or repudiates it. Either of them can terminate it at the end of any year, but so long as it stands and is complied with by one party, the other party must comply also." There was no opinion filed in the case. The conclusion reached in that case was, in our opinion, correct, and we believe that the reasons which have been heretofore given are sufficient to show that such is the case, and therefore we approve the ruling therein made and decline to overrule the decision. The decision in the case just referred to was followed in the case of *Cartersville Water Company* v. *Cartersville,* 89 *Ga.* 689.

In *Lewis* v. *Lofley,* 92 *Ga.* 804, the case of *Butts* v. *Little,* supra, was overruled so far as it was in conflict with what was then ruled. The court there held that, "Without the preliminary sanction of a popular vote as required by the constitution, the public authorities of a county can not contract for the building of a court-house on the credit of the county for an amount in excess of funds in hand and the proceeds of taxation applicable to the object for the year in which the contract is made." Justice Simmons in the opinion says: "We see no reason, therefore, why the county authorities in this case may not levy a sufficient tax in one year to pay for the erection of a court-house, if the tax be not exorbitant; and if they can do this, no reason now occurs to us why they can not make a contract for its erection, the cost to be paid out of the taxes thus levied. If there are funds in the county treasury sufficient for the purpose, the county authorities may contract for its erection, payment to be made when the building is completed, or in instalments as the work progresses. Or if taxes are levied or can legally be levied for the year, sufficient for the purpose, they may contract to pay for it out of such taxes although they are uncollected."

There was no ruling at all on the question now under consideration in the case of *Dawson Water Co.* v. *Carver*, 95 *Ga.* 565.

In *Habersham County* v. *Porter Mfg. Co.*, 103 *Ga.* 613, the decision in *Lewis* v. *Lofley* was under review and was in that case adhered to and reaffirmed. When we had under consideration the case last cited, we saw no reason why the conclusion reached in *Lewis* v. *Lofley* was not sound, and we do not now see any reason for overruling or modifying either decision. Both of them seem to be in accord with our views as above expressed, and for that reason the conclusion reached in each case is adhered to and reaffirmed.

It appears, therefore, that nothing that is herein said is in conflict with what has been heretofore ruled by this court, excepting the cases of *Spann* v. *Webster County*, *Cabaniss* v. *Hill*, and *Butts* v. *Little*. The first two cases are now overruled, so far as there is anything in either to conflict with what we now hold, and *Butts* v. *Little*, so far as it is inconsistent with the ruling now made, has never been followed, and has been to that extent expressly overruled, as we have seen, in *Lewis* v. *Lofley*. The conclusions reached, as well as the reasoning upon which such conclusions are based in all other cases, are not only not in conflict with what we now rule, but in entire accord with the same. It may therefore be now accepted as the settled law of this State, that contracts of the character under consideration in the present case, so far as they attempt to provide for the payment of any sum other than that for the year in which the contract is made, create a debt within the meaning of the constitution, and are subject, after the expiration of the first year, to repudiation by either party.

2. While it may not be necessary in the present case to decide whether the clause of the constitution under consideration requires legislative action prescribing the way in which the election therein provided for shall be held, my investigations have satisfied me that such legislative action is essential to the validity of the election. The reasons which bring me to this conclusion will be stated, but on this question I am speaking for myself alone. Any liability which is a debt within the meaning of the constitutional provision above quoted can not

be incurred without the assent of two thirds of the qualified voters of the municipal corporation "at an election for that purpose, to be held as may be prescribed by law." In the case of *Hudson* v. *Marietta*, 64 *Ga.* 286, it was held in a decision rendered by two Justices that, until the General Assembly had by an act prescribed the manner of holding the election, a municipal corporation had no authority to incur a debt in order to make an exchange of fire-engines in the fire department of the city. It was further held that "A mere vote on the question of exchange or no exchange, held under no law passed by the General Assembly to carry into effect the mode of avoiding this prohibition on new debts, and held under no law of the State or the city prescribed for such an election at any time, can not be held to be such an authorization of a new debt as will comply with the constitution and relieve the city from the prohibition." Justice Jackson, speaking almost in the very atmosphere of the convention which adopted this constitution, after quoting the section with which we are dealing, uses this language: "It is not pretended that any law has been passed authorizing such increase of debt, or to hold such an election as is contemplated in the above-cited section; and the election actually held did not comply with the constitution. So that it is an effort on the part of this city to make a new debt, incurred to procure a steam fire-engine in the place of an old hand engine, at a considerable cost, without complying with that provision of our present constitution. It can not be done. The provision is inserted therein to stop, to dam up, this deluge of city and county debts which is flooding the country, and sinking the best interest of the people." When the constitution provides that no municipal corporation shall incur a debt until an election for that purpose shall be held "as may be prescribed by law," it undoubtedly contemplates that action by the General Assembly is necessary in order to carry into effect the provision which authorizes municipal corporations under certain conditions to incur new debts. The decision above referred to clearly establishes this proposition. See in this connection *Elliott* v. *Gammon*, 76 *Ga.* 766. There must be either a general law pre-

scribing the manner of holding the election, or, in the absence of such general law, each municipal corporation desiring to incur a new debt must have express legislative authority prescribing the manner in which the election shall be held. The constitutional provision does not empower either municipal corporations existing at the time of its adoption, or those created thereafter, to deal with the subject of elections to incur debts. The constitution further contemplates that the debt incurred by municipal corporations may belong to that class known as a "bonded indebtedness," and it prescribes what shall be done by the municipality when the debt belongs to that class. Civil Code, § 5894. That municipal corporations may incur debts other than a bonded indebtedness is also contemplated by the constitution, for it is therein provided that "Municipal corporations shall not incur any debt until provision therefor shall have been made by the municipal government." Civil Code, § 5897. If a municipal corporation incurs a bonded indebtedness, it is required that there shall be the "assessment and collection of an annual tax, sufficient in amount to pay the principal and interest of said debt within thirty years from the date of the incurring of said indebtedness." Civil Code, § 5894. If the debt to be incurred is one other than a bonded debt, the constitution still requires, as above shown, that provision shall be made for the payment of the same, but the limitations placed upon the corporation in regard to bonded indebtedness are not imposed in regard to other debts. While municipal corporations may incur debts both bonded and otherwise, still, whatever the character of the debt may be, if it does not come within the exception referred to in the clause of the constitution first quoted, the debt can not be incurred until the assent of two thirds of the qualified voters has been obtained at an election held in the manner prescribed by law.

3. The General Assembly has prescribed the manner in which the election shall be held when the debt to be incurred is a bonded debt. Political Code, § 377 et seq. It is provided that the city authorities shall give notice for the space of thirty days next preceding the day of the election, in the newspaper in which the sheriff's advertisements for the county are published,

notifying the qualified voters that on the day named the election shall be held.    In the notice the amount of bonds to be issued, what interest they are to bear, how much principal and interest to be paid annually, and when to be fully paid off, shall be specified.    The election shall be held at all of the voting precincts within the limits of the municipality, and shall be held in the same manner, and by the same persons, and under the same rules and regulations that elections for municipal officers are held, and the returns shall be made to the officers calling the election.    In determining the question whether or not two thirds of the qualified voters of the municipality voted in favor of the issuance of the bonds, the tally-sheets of the last general election held in the municipality shall be taken as a correct enumeration of the qualified voters.    Whether or not a registry of the voters is necessary at any such election depends upon the charter provisions of each city, as will be seen by reference to the following cases: *Bell* v. *Americus,* 79 *Ga.* 153; *Gavin* v. *Atlanta,* 86 *Ga.* 132; *Kaigler* v. *Roberts,* 89 *Ga.* 476; *Howell* v. *Athens,* 91 *Ga.* 139; *Heilbron* v. *Cuthbert,* 96 *Ga.* 312.

4.    There is no general law of this State prescribing the manner in which an election shall be held by a municipal corporation on the question of incurring a debt other than a bonded debt within the meaning of the constitutional provision above referred to.    The General Assembly has never expressly conferred upon the City Council of Dawson the power to prescribe the manner of holding an election in that city for this purpose. In the absence of a general law providing for such election, and in the absence of a special law expressly conferring upon the municipality power to deal with this subject, is not any election held clearly without authority of law?    See *Hudson* v. *Marietta,* cited supra.    If it were necessary to so hold in the present case, there would be nothing in such a ruling to conflict with the decision of this court in *Mayor of Griffin* v. *Inman,* 57 *Ga.* 370.    The city authorities of Griffin had express legislative power, on a recommendation of a majority of citizens, either in public meeting or by public election, to subscribe for the stock of railroads, to borrow money on the faith and credit of the city to pay for the same, and to impose a special tax to

meet the debt thus created.    It was held that an amend-
ment to the charter of the city, passed in 1859, which contained
the provision above referred to, was not repealed by that clause
of the constitution of 1868 which declares that "No law shall
be passed by which a citizen shall be compelled, against his
consent, directly or indirectly, to become a stockholder in, or
contribute to any railroad,   . .   except in the case of the in-
habitants of a corporate town or city.    In such cases, the Gen-
eral Assembly may permit the corporate authorities to take
such stock or make such contribution  . .   after a majority of
the qualified voters of such town or city, voting at an election
held for the purpose, shall have voted in favor of the same, but
not otherwise."   It was further held that the amendment should
be construed in connection with the clause of the constitution
above quoted, and thus construing the two together, the proper
mode of taking the sense of the citizens in 1871 was to order
a public election by all of the qualified voters of the city, with
the privilege to each and every qualified voter to vote for or
against the proposed subscription.    The question as to whether
in such a case a legislative act was necessary was not involved, be-
cause there was a legislative act authorizing the city to hold the
election, and the only question was as to who was embraced within
the meaning of the term "citizen," as it was used in that act.

5. But even conceding, for the sake of the argument, that no
legislative action was necessary in order to authorize a munici-
pal corporation to call an election, we can not hold that what
was done by the city authorities of Dawson in this case was, in
any sense of the word, a compliance with either the letter or
the spirit of the constitution.    The purpose of the constitution
was to limit the amount of indebtedness that could be incurred
by cities, and within the limit thus fixed to provide, with one
single exception, that is the case of casual deficiencies of reve-
nue, that all debts incurred should have the assent of two thirds
of the qualified voters of the municipality.    If the ordinance
calling the election does not prescribe the amount of indebted-
ness to be incurred, and if the notice of the election does not
fix an amount, no matter whether the vote be unanimous or
not, the whole purpose of the constitutional provision is thwarted.

To hold that such an ordinance and such a notice would give a municipal corporation the power to incur whatever debt is necessary to accomplish the object referred to in the ordinance and the notice, would be simply conferring upon the city authorities unlimited power to do that which the constitution says that they shall not have authority to do. If two thirds of the qualified voters of a city can confer upon municipal officers the power to incur an unlimited debt in order to provide waterworks, why may not the voters, instead of dealing with the subject of municipal expenses separately, simply empower the authorities to incur expenses necessary for waterworks, electric lights, police, and all other things needful for the successful administration of the city government, and thus avoid the expense and trouble of submitting these questions from time to time to the qualified voters. It seems to us that argument is unnecessary to establish the proposition that an election held under such a notice would be practically a nullification of the constitutional provision. If we are correct in this, the ordinance passed by the city authorities of Dawson, providing for an election, and the notice published in pursuance thereof, was not such a compliance with the constitution as would authorize them to incur any debt whatever. And this view of the case is strengthened when we take into consideration that the election was held in 1886, and the contract claimed to have been made pursuant to that election was not made until 1890, four years later, and that there is nothing to indicate that the people who voted at the election had the slightest conception of the amount of debt to be incurred, when to be paid, or of the details of the contract of indebtedness which it is claimed they assented to by voting in the election. The policy of the constitution is against the incurring of municipal debts, and therefore the constitutional provision prescribing the manner in which debts must be incurred is to be strictly construed. It has been the uniform ruling of this court that not only the constitutional provision must be strictly construed, but that the act of the General Assembly prescribing the manner in which an election shall be held on the question of bonded indebtedness shall be also strictly construed. *Walsh* v. *Augusta,* 67 *Ga.* 293; *Cabaniss* v. *Hill,* 74

*Ga.* 845; *Bowen* v. *Greenesboro*, 79 *Ga.* 709; *Mayor of Athens* v. *Hemerick*, 89 *Ga.* 674; *Ponder* v. *Forsyth*, 96 *Ga.* 572; *Mayor of Perry* v. *Norwood*, 99 *Ga.* 300. While an examination of the cases cited will probably show that in the later cases there has been some departure from the very strict rule of construction laid down in the earlier decisions, no such departure has taken place as would justify us in holding that the notice of an election, where the question of incurring a debt is to be decided, would be sufficient when the amount of the debt to be incurred was not in any way specified, either in the ordinance calling for the election, or in the notice. In the case of *Irvin* v. *Gregory*, 86 *Ga.* 605, it was held that in an election held to determine whether a school law should be adopted, a failure to publish the notice of the election the number of times required by law would be held to be a mere irregularity after the election had been held and the result acquiesced in by the citizens. In the case of *Brand* v. *Lawrenceville*, 104 *Ga.* 486, it was held that, "Though the notice of the election provided for by such an act may not in the clearest and most unequivocal terms have submitted to the qualified voters the question of adopting the act itself, yet where the terms of the notice were such as to show that this question was necessarily to be passed upon in the election, the failure to use more explicit language in this respect (the notice, as to all other matters, being sufficient) will, after the election has taken place, and after the bonds, in pursuance of its result, have been issued and sold and their proceeds applied as required by the act, be treated as a mere irregularity not invalidating the bonds, and one of which it is too late for a taxpayer who participated in the election, and who had knowledge of all the facts, to complain."

6. It is contended, however, that the city authorities should not be allowed to set up the defense insisted upon in this case, because the waterworks company, upon the faith of the contract, has expended a large amount of money in constructing the plant necessary to operate the system, and that it would be such a fraud upon it to now refuse to pay that the municipal authorities should be estopped from setting up the want of power to make the contract sued upon. All persons who deal

with public officers act at their peril, and are charged by law with notice of the authority of the officers with whom they deal.    If the city authorities of Dawson had no power under the constitution and laws of this State to hold the election and make the debt claimed to have been incurred in pursuance thereof, the waterworks company is charged with notice of such want of power, and it can not be said to be a fraud upon it to set up a defense based upon a fact of which it was charged by law with notice.    Even if a benefit has been received by one of the contracting parties from a contract which is void because prohibited by the constitution, or because contrary to public policy, the receiving of such benefit will not prevent the party receiving it from setting up against a suit to enforce the contract the defense that the contract was illegal and void. See *Covington & Macon Railroad Co.* v. *Athens,* 85 *Ga.* 367. To establish the rule that all that is necessary to prevent a city from pleading that under the constitution and laws of the State it could not incur the indebtedness sought to be charged against it would be to show that the alleged illegal contract had been fully performed on one side, would place entirely within the power of persons desiring to make illegal contracts the determination of the question as to whether the constitution of the State shall be enforced in a particular instance. Where a municipal corporation has the power to incur a debt, and the debt is incurred in an irregular way, it is settled law that the innocent holder of a negotiable instrument issued by the authorities of such city, and which recites a compliance with the law in regard to the incurring of the debt, will be entitled to prevail in a suit to enforce the collection of such instrument, notwithstanding a defense setting up the irregularities in the manner in which the debt was incurred.    *Black* v. *Cohen,* 52 *Ga.* 621.    The contest in the present case being between the original parties to the contract, and no negotiable instrument ever having been issued, the law in relation to the innocent holders of such instruments has no application whatever.    The promoters who were afterwards incorporated as the Dawson Waterworks Company were charged by law with knowledge of what the constitution and statutes of this State required

in regard to such contracts, as well as what had transpired in the City of Dawson and now claimed by them to be a compliance with the law in regard to the incurring of debts; and it being, as we have shown, not within the power of the City of Dawson to make the contract, no estoppel is raised by law to prevent the city authorities from calling in question the legality of the contract relied on by the defendant in error.

7. When this case was here before (102 *Ga.* 594), it was ruled that, "This being an action against a municipal corporation for a year's supply of water, in which the plaintiff's right of recovery depended upon the validity of an alleged contract between it and the defendant, covering a period of years, and the evidence not affirmatively disclosing that when the contract was originally made the municipal corporation had, in the manner prescribed by the constitution of this State, made due and lawful provision for the payment of the yearly sums to become due on such contract, it was error to direct a verdict for the plaintiff." There is nothing in our present ruling which conflicts with this decision. Upon an investigation of the case as then presented, it was found that one absolutely essential element necessary to constitute a cause of action was wanting, and the case was reversed because the direction of a verdict for the plaintiff was erroneous for that reason. There was no ruling made on any of the questions now decided, although such questions were made in the record. The record in the case did not disclose an ordinance which made provision for the debt, and if all of the other constitutional and statutory requirements had been fulfilled, the absence of this ordinance would have required a reversal of the case. The extent of the ruling in that case was simply that without such an ordinance there could be no cause of action, and whether the other elements necessary to constitute the cause of action were present was not passed upon.

8. While either party to the contract in question can terminate it at the end of any year, as long as it stands and is complied with by one party the other must comply also. *Ford* v. *Cartersville*, 84 *Ga.* 213; *Lott* v. *Waycross*, Ibid. 681; *Cartersville Improvement Co.* v. *Cartersville*, 89 *Ga.* 683; *Dawson Waterworks Co.* v. *Carver*, 95 *Ga.* 565.

As the judge was not authorized to direct a verdict for the plaintiff on the ground that the contract was valid, and therefore the amount due thereon should be paid according to the terms thereof, the question arises: Was the evidence of such a character as to demand a finding in favor of the plaintiff upon the theory that the defendant had received benefits from the contract during the year 1895, and was for that reason liable for the amount stipulated in the contract to be paid annually? After a careful examination of this record we can not say that the evidence demanded this finding. While the great preponderance of the evidence is in favor of such finding, there is some evidence upon which a jury could base a finding in favor of the defendant; and we think that the case should have been submitted to a jury under proper instructions. If the jury should believe that the City Council of Dawson maintained its fire department intact during the year 1895, without any substantial change as to its organization or rules from what it had been in previous years, and had failed to notify the officers and members of this department of its intention to abandon the contract with the waterworks company, and also failed to provide any appliances or means to extinguish fires independently of the water which would be furnished by the waterworks company, and did in fact during the year in question make use of the water of the plaintiff company to extinguish a fire or fires, they would be authorized to find that the resolution passed in 1894, terminating the contract with the waterworks company at the end of that year, even if passed in good faith, was not adhered to in good faith, and that the acts above recited, if true in fact, amounted to a waiver of the resolution, so far as payment of the amount due under the contract for 1895 was concerned. If, on the other hand, a jury should believe that the resolution terminating the contract was passed in good faith; that the city authorities did all in their power to carry it into effect; that they notified the officers and members of the fire department that the contract was terminated and that the water was not to be used, and persisted in its refusal to use the water or to permit any one to use the water in behalf of the city on any occasion, a verdict in favor of the

defendant would not be without evidence to support it.

*Judgment reversed.    All the Justices concurring.*

SIMMONS, C. J., concurring specially.    This court having held, when this case was here before, that the contract between the city and the waterworks company created a debt, I am bound by that decision.    It is the law of this case, whether it was right or wrong.    The majority of the court having determined not to overrule the cases on the same line, I am likewise bound by them.    If it were an original question, I should hold, in accordance with nearly all the other courts of the Union, including the Supreme Court of the United States, when construing similar provisions of constitutions or statutes, that the making of a contract or agreement by municipal authorities for the supply of gas or water for a term of years, for a certain sum to be paid annually, is not a debt within the meaning of the constitution.    It is difficult for me to understand now, after full argument and reflection, how the making of the same contract by the same authority for one year, when there is no money in the treasury to pay it and taxes are to be levied to meet the obligation, is not a debt; when if the same authority makes a contract for the same purpose for two years, or five years, it is a debt.