[No. 2667.]

HOVER ET AL. v. THE PEOPLE EX REL. ADAMS ET AL.

1. **Cities and Towns—City of Denver—Appropriations—Fire and Police Board.**

Under the charter of the city of Denver the city council, in making appropriation for the expenses of the fire and police board, is required to consider and base its appropriation upon the estimate furnished by the fire and police board and not upon an estimate furnished by the mayor.

2. **Same—Commissioner of Supplies.**

Under the charter of the city of Denver the fire and police board have exclusive authority to expend for and on behalf of the city, all funds set apart in the annual appropriation ordinances for the use of the board, and a provision in the appro-

priation ordinance that an appropriation to purchase a fire engine, hose etc., should be expended by the commissioner of supplies, is absolutely void and the board would have the right to direct the expenditure of the fund, notwithstanding such provision.

3. Same—License Inspectors—Mandamus. ´

The city council of the city of Denver will not be compelled by mandamus to make an appropriation to pay the salaries of license inspectors in accordance with an estimate furnished by the fire and police board where such inspectors are not provided for in the charter and nothing appears in the alternative writ to indicate what such inspectors are or how the office was or would be created, or how the inspectors were or would be appointed.

4. City of Denver—Appropriations—Fire and Police Board—Mandamus.

The charter of the city of Denver providing that the fire and police board shall present to the city council a detailed statement of the money necessary to defray the expenses of that department for the succeeding year and that the city council shall provide for the appropriation of money sufficient to defray such expenses, using the estimates of the board as a basis for such appropriation, and conforming thereto as nearly as the condition of the city finances will permit, does not require the city council to appropriate the exact sums named in the statement of the fire and police board. If the city council should fail to make any appropriation for the use of the fire and police board it may be compelled to do so by mandamus, but it cannot be compelled by mandamus to appropriate the sums named in the statement of the fire and police board.

5. Practice—Mandamus—Demurrer.

A demurrer to the answer in mandamus proceedings relates back to the alternative writ, and if that writ is insufficient it should be so adjudged.

*Appeal from the District Court of Arapahoe County.*

Mr. HARPER M. ORAHOOD, Mr. HALSTED L. RITTER and Mr. CALVIN P. BUTLER, for appellants.

Mr. MILTON SMITH, Mr. JOHN T. BOTTOM and Messrs. PATTERSON, RICHARDSON & HAWKINS, for appellees.

THOMSON, J.

Proceeding in mandamus to compel the city council of the city of Denver to pass, and the mayor to approve, an ordinance appropriating certain specified sums of money to defray the expenses of the fire and police board during the year 1902.

The averments of the petition, recited in the alternative writ, were that on the 29th day of November, 1901, the board presented to the mayor a detailed statement of the moneys necessary to defray its expenses during the year 1902, from which it appeared that the following sums were required: For the maintenance of the fire department, $225,511; for the maintenance of the police department, $244,403.68, and for the maintenance of the bureau of excise, $4,800; that this statement was thereupon transmitted by the mayor to the city council; that the mayor in making his recommendations for the annual appropriation ordinance for the year 1902, disregarded the statement of the fire and police board, and recommended for the fire department an appropriation of only $160,000, and for the police department an appropriation of only $150,000, and recommended no appropriation for the bureau of excise; that the total revenue of the city for the year 1902 from the tax levied for general purposes, and from licenses and other sources, was estimated at the sum of $966,406; that the board of aldermen, on the 10th day of January, 1902, passed a bill for an ordinance making appropriations for the support and maintenance of the several departments for the year 1902, in which an insufficient amount was set aside for the fire and police board; that the board of supervisors threaten to pass, and the mayor to sign, the same bill; that the amounts asked by the board are necessary for the maintenance of the several departments under its control; that the bill as passed by the board of alder-

men makes unnecessarily large appropriations for the maintenance of other departments, thus absorbing revenue which would otherwise be available to the board; and that a sufficient appropriation for the necessities of the board cannot be had, unless it be compelled by a writ of mandamus. The alternative writ commanded the board of aldermen and the board of supervisors, together constituting the city council, to pass, and the mayor to sign, an ordinance appropriating to the fire department for its maintenance during 1902 $225,000, to the police department $224,000, and to the bureau of excise $4,800; or, on a day specified in the writ, to show cause why they should not be required so to do.

The respondents demurred to the alternative writ for insufficiency. Their demurrer was overruled, and they answered denying that the amount demanded by the board was necessary for the maintenance of its bureaus, or that the public interest required the appropriation asked, or that the other appropriations were excessive. The answer also set forth in full the statement presented on the 14th day of December, 1901, by the mayor to the city council, of the amounts necessary to defray the expenses of the city government for the ensuing year, and the bill for the annual appropriation ordinance passed by the board of aldermen in pursuance of the mayor's statement. In the statement of the mayor shown by the answer, he recommended an appropriation of $160,000 to the fire department, but modified, the recommendation by a request that out of the amount there should be expended the sum of $20,000 for a fire engine and hose, and for other purposes. The bill as passed by the aldermen provided for an appropriation to the police department of $150,000—the sum named by the mayor. The following is the provision of the bill in relation to the fire department:

"There is hereby appropriated to the fire and police board for the use of the fire department of the city of Denver the sum of one hundred and forty-seven thousand dollars ($147,000) for the payment of salaries, rentals, electric lights, gas, repairs on fire apparatus, and all other expenses incidental to the operation and maintenance of said fire department. There is further appropriated the following sums of money to be expended by the commissioner of supplies for the use of the fire department: The sum of five thousand five hundred dollars ($5,500) for the purchase and installation into service of a No. 1 Metropolitan fire engine; four thousand dollars ($4,000) for the purchase of five thousand feet of standard hose; and three thousand five hundred dollars ($3,500) for necessary repairs on the several hose houses."

A demurrer to the answer was sustained, and the alternative writ made peremptory.

The fire and police board of the city of Denver was established by an act of the legislature, approved March 4, 1891, entitled "An act to repeal articles 7 and 8 of 'An act to reduce the law incorporating the city of Denver and the several acts amendatory thereof into one act, and to amend and revise the same,' approved March 16, 1885, and to enact articles in lieu thereof."—Session Laws 1891, p. 65.

The articles which were repealed related to the police department and the fire department. Article 7 provided for a police department, composed of a chief of police, to be appointed by the mayor with the consent of a majority of the members elect of the board of supervisors, together with such policemen as might be appointed by the mayor without confirmation; and a board of police, consisting of a mayor, the president of the board of supervisors, the president of the board of aldermen, and one other super-

visor, and one other alderman, to be appointed by the mayor.   Article 8 provided for a fire department, consisting of a chief engineer, an assistant chief engineer and a fire warden, to be appointed by the mayor, with the consent of a majority of the members elect of the board of supervisors, and of the members of the several fire companies to be appointed by the mayor, and, at his discretion, discharged.—Session Laws 1885, pp. 107, 110.

The enactment which took the place of the repealed articles, provided for the appointment by the governor of the state, with the advice and consent of the senate, of three persons, who should constitute the fire and police board, and vested in the board so constituted all powers and duties connected with the appointment, removal, government and discipline of the officers and members of the fire and police departments, and the fixing of their salaries, under rules and regulations to be adopted by the board.   It also contained the following provision:

"During the last quarter of the calendar year, the said fire and police board shall present to the city council of the city of Denver, a detailed statement of the money necessary to defray the expenses of the fire, police and detective departments of the city for the succeeding year, together with a statement of the probable expenses to be incurred by said board; and in the annual appropriation ordinance for the next calendar year, the city council shall provide for the appropriation of sums of money sufficient to defray the expenses incident to said departments and to be incurred by said board."—Session Laws 1891, pp. 65, 68.

This provision was subsequently amended by adding the words, "using such estimates as a basis

for such appropriation, and conforming thereto as nearly as the condition of the city finances will permit."—Session Laws 1891, p. 74.

On April 3, 1893, an act was approved entitled "An act to revise and amend the charter of the city of Denver."—Session Laws 1893, p. 131.

By that act, previous legislation, unchanged, or with altered phraseology, and new provisions, were consolidated into the present charter of the city. The constitution of the fire and police board is provided for in section 44 of article 3 of this charter, as follows:

"The department of public health and safety shall include the following officers, who shall respectively be the heads, and have active charge of the affairs, of the following bureaus, to wit: A fire commissioner, of the bureau of fire. A police commissioner, of the bureau of police. An excise commissioner, of the bureau of excise. A health commissioner, of the bureau of health. A commissioner of inspection, of the bureau of inspection. The fire commissioner, police commissioner and excise commisisoner shall constitute the fire and police board of the city of Denver, and all the operations of the bureaus of fire, police and excise, shall be subject to the general control of said board."

The section following, in so far as it provides for the manner of appointment of the members of the board, is taken from section 1 of the act of March 4, 1891, establishing the board. The provision of the latter act concerning appropriations for the expenses of the fire and police board, and the subsequently added words, appear in section 53 of article 3 of the charter in the following form:

"During the last quarter of each calendar year, said board shall present to the mayor of the city of Denver, a detailed statement of the moneys necessary

to defray the expenses of said board during the succeeding year, with a statement of the probable expenses to be incurred by said board; and in the annual appropriation ordinance for the next calendar year, the city council shall provide for the appropriation of sufficient moneys to defray the expenses incident to and to be incurred by said board in the exercise of the powers hereinabove granted, using such estimates as a basis for such appropriation, and conforming thereto as nearly as the city's finances will permit.''

The general annual appropriation is provided for in section 6, article 6, as follows:

''During the last quarter of each calendar year, the mayor shall present to the city council a detailed statement of the moneys necessary to defray the expenses of the city government for the next year, and for this purpose shall require from the heads of the various departments of the city government detailed statements of the probable expenses to be incurred in their several departments. As soon thereafter as possible, the city council shall pass an annual appropriation ordinance for the next calendar year, providing for the appropriation of certain definite sums of money to defray the expenses incident to each department of the city government, based upon the estimate of the mayor, but not of necessity governed by it. The total amount appropriated by such ordinance shall in no case exceed the probable amount of money that will be received during the year by taxation and from other sources of revenue.''—Session Laws 1893, p. 197.

By section 20 of article 2, the management and control of the city's finances, and all property of the corporation, is confided to the city council, except as otherwise provided in the act; and the council is empowered to provide for the purchase of steam fire

engines and other apparatus for the extinguishment of fires.—Session Laws 1893, pp. 144, 149.

Sections 47 and 48 of article 3 confer upon the fire and police board "full, complete and exclusive power and authority on behalf of the city to perform all executive functions of the city in the organization, management and control of the fire and police departments of the city"; and, in the exercise of the powers conferred by the act, "full, complete and exclusive authority to expend, for and on behalf of the city, all funds set apart in the annual appropriation ordinance for the use of said board."—Session Laws 1893, pp. 173, 175.

Some incidental subjects of dispute between counsel will be disposed of before a consideration is entered upon of the principal question in the case. In behalf of the mayor and council it is urged that as the fire and police board is required by the terms of section 53 of article 3 to present its statement of the moneys it deems necessary, to the mayor, and as section 6 of article 6 provides that the mayor shall present to the city council a detailed statement of the moneys necessary to defray the expenses of the city government for the next year, and shall require from the heads of the various departments of the city government the information necessary to his statement; and as the latter section further provides that the appropriation ordinance following the mayor's statement, shall be based upon it, but not necessarily governed by it; the estimates for the fire and police departments which are laid before the council, are the mayor's estimates, and the council is clothed with the same discretionary authority to say what the appropriation for the board shall be, that it possesses in respect to the other departments, and that such discretion is beyond the control of the courts.

The portion of section 6, of article 6, which I

have quoted, was taken from the act of April 2, 1885, and was section 6 of article 6 of that act. By articles 7 and 8 of the same act, the officers of the fire and police departments received their appointments from the mayor. He was chairman of the board of police, he appointed the policemen, and he appointed, and, at his discretion, discharged the members of the fire companies. The same relations existed between him and all the departments of the city government, and he had the same right to require statements of probable expense from one department as from another. But in 1891, his relations with the fire and police departments were dissolved. The fire and police board then established, while it is one of the agencies for the accomplishment of the purposes for which the municipality was organized, and is a part of the city government, is independent of the mayor. It is its estimates, and not the mayor's statement, that the council must use as a basis for the appropriation made to defray its expenses. The fire and police departments, for whose expenses he was required to present estimates by the act of 1885, ceased to exist; and he is not authorized to speak for the fire and police board. The law requiring estimates from him is still in force, but the fire and police board was never within its operation.

However, in opposition to this view, it is said that when the provision of the original act establishing the fire and police board that its estimates should be presented directly to the city council, was so changed as to require their presentation to the mayor, that board was placed upon an equality with the other departments, and required like them to furnish a report to the mayor, to be incorporated by him into his own detailed estimate; and it is argued that the very fact of the change indicates that such was the legislative intent. But the particulars in which the

later law differs from the former, and upon which counsel venture no comment, vitiate the reasoning and invalidate the conclusion. As no estimate of the board's expenses except its own can be considered by the council, and as the appropriation can be based on no estimate except the one furnished by it, it seems evident to me that the legislature regarded the presentation of the board's statement to the mayor merely as a more convenient method of bringing it to the attention of the council, and that the mayor's duty is simply to transmit it to that body without expression of his own views. The incorporation into his statement of a recommendation respecting the appropriation to be made for the board, is absolutely purposeless. It imparts no symmetry to the document, and is without practical utility.

The bill passed by the aldermen, and now resting with the supervisors, appropriated $13,000 for the use of the fire department to be devoted to the purchase of a fire engine and a quantity of hose, and to repairs on hose houses, the money to be expended by the "commissioner of supplies." The appropriation of $13,000 for the use of the fire department would be valid, and would give the fire and police board the right to the money; but a provision that the money should be expended by the "commissioner of supplies" or by any other agency than the board itself, would be absolutely void. The law gives the board general control of all the operations of the bureaus of fire, police and excise; and full, complete and exclusive power in behalf of the city to perform all executive functions of the city in the organization, management and control of the fire and police departments; and the full, complete and exclusive authority to expend for and on behalf of the city, all funds set apart in the annual appropriation ordinances for the use of the board. The powers granted

to the board are expressed in absolute terms. The language employed renders doubt as to the intention of the legislature impossible. The bill sets apart $13,000 for the use of the board, but provides for its expenditure through another agency. This provision for the expenditure of the money is in direct contravention of the law. In the operation of its bureaus, the performance of its executive functions, the control of the fire and police departments and the expenditure of all funds set apart for its use by the annual appropriation ordinance, its authority is full, complete and exclusive, and the city council is absolutely powerless to take from it a single one of its prerogatives.

But certain other charter provisions are mentioned by which it is said the grants of authority to the board are qualified. Among the powers granted to the city council is one ''to provide for the purchase of steam fire engines and other apparatus suitable for extinguishing fires.'' In the charter of 1885, of which the present one is the successor, the language was, ''to procure steam fire engines and other apparatus suitable for extinguishing fires.''—Session Laws 1885, page 84. By this provision the council was authorized to act directly in the purchase of the engines and apparatus. But when the fire and police board was established and its powers defined, the lnguage was changed, and the authority of the council limited to making provision for the purchase, the expenditure of the money provided, being confided to the board. Section 50 of article 3 of the present charter provides that immediately upon the appointment of the board all engines, horses and other property pertaining to the fire and police service shall be turned over to the board, and such property together with all appliances thereafter purchased or acquired *by or for the city* shall be under the

control and management of the board. In the words
"purchased or acquired by or for the city," counsel
find an implication that the power of the fire
and police board to make the purchases and expend
the money is not exclusive—that it is shared with the
city itself. I do not think those words are even sug-
gestive of difficulty. The corporation operates only
through its officers and agents. An act done by its
agent or officer properly authorized, is an act done
by and for it. The fire and police board is one of
the agencies through which the city acts. Whatever
is lawfully done by that board is done in behalf of the
city; and any purchase or expenditure made by it in
pursuance of the authority with which the law has
clothed it is a purchase or expenditure by and for the
city.

By section 94 of article 3 it is provided that the
superintendent of supplies—not "commissioner of
supplies"—shall, for and in behalf of the city, pur-
chase all furniture, books, stationery, tools, materials
and supplies, and all things whatsoever necessary for
the use of the several departments, officers and em-
ployees of the city. The foregoing would hardly give
the superintendent of supplies any authority in the
way of expending money appropriated to the fire and
police board for the purchase of an engine and hose,
and the repairs of hose houses. The enumerated
items could scarcely be said to include fire appliances
and apparatus, or the repair of hose houses. And the
words, "and all things whatsoever necessary for the
use of the departments, offices and employees of the
city" add nothing to the scope of the preceding
language. They are *ejusdem generis,* and embrace
only articles of the same kind with those enumerated.
—*St. Louis v. Laughlin,* 49 Mo. 559; *Morse v. Morri-
son,* 16 Colo. App. 449, 66 Pac. 169. But aside from
all this for the reasons that the authority of the board

as to the expenditure of money appropriated to its own use is exclusive, the provisions respecting the superintendent of supplies has no application to it. By express law that officer is debarred from handling its money. When the appropriation for the use of the board is made, no limitation by the council upon the authority of the board in relation to the expenditure of the fund is of any effect.

The bill adopted by the aldermen appropriates nothing for the maintenance of the bureau of excise. If an appropriation to that bureau is required by law, the council has no discretion to refuse it. Whatever right it may have to determine the amount, an appropriation must be made. It is contended, however, that the appropriation for this bureau asked by the fire and police board, is not required by law. In the detailed statement presented to the mayor by the board, the following was the estimate for the bureau of excise:

"Four license inspectors, $100.00 per month." The charter makes no provision for license inspectors. Whether these particular inspectors are already in office, or are yet to be appointed, or what duties, when appointed, they are supposed to perform, we are not advised. By section 77 of article 3, the fire and police board is given exclusive authority to grant, refuse and revoke licenses for certain occupations, including the selling and giving away of intoxicating or malt liquors. By section 19 of the same article application for license is made to the board, the applicant deposits the necessary money with the treasurer, the board passes upon his application, and, if it be granted, the treasurer issues the license. Section 78 authorizes the revocation of a license by the board after a hearing upon a complaint signed by three reputable citizens of the proper election precinct, charging the holder of the license with the vio-

lation of some statute or ordinance. The foregoing is
the entire statute law relating to the bureau of excise;
and I am unable to see in what duty assigned to that
bureau the assistance of license inspectors is required.
But if they are required, provision is made for their
appointment. By the terms of section 4, article 3, the
board may, with the approval of the mayor, adopt
rules for the appointment, conduct, discipline, com-
pensation and removal of its own subordinates and
employees; and may appoint and remove all such
clerks, assistants and other officers, subordinates and
employees as may be necessary in the exercise of its
powers, and the performance of its duties. Of course
the appointment or removal must be in accordance
with the rules adopted with the consent of the mayor.
The license inspectors for whose salaries an appro-
priation was asked are not statutory officers. Unless
created by some agency empowered for the purpose
by the charter, there is no such office; and if so cre-
ated, not being statutory, courts cannot take judicial
knowledge of its existence. I find nothing in the
alternative writ to indicate what these license inspect-
ors are, or what it is proposed they shall be; how the
office was created, or if not created, how it is intended
it shall be created, or in what manner the inspectors
have been, or are to be appointed. Without informa-
tion of any kind on the subject, no court can say that
it is the duty of the council to appropriate money for
the payment of the supposed inspectors' salaries.
The case of *Morgan v. Denver,* 14 Colo. App. 147,
referred to on both sides, is not in point. The license
inspector whose claim was adjudicated in that case,
was appointed pursuant to an ordinance creating the
office, and defining the duties of the inspector. This
court held that in virtue of the various services re-
quired of him by that ordinance, he assisted the treas-
urer, the fire and police board and the department of

law, but was not in the special employ of any one of them.

The questions I have been considering are the subject of considerable argument by counsel; and their solution appears.to be regarded as having a relation of some kind to the real subject of the controversy. But while, in its details, the proposed ordinance should conform to the law, a decision that it ought to embrace certain matters and exclude certain other matters, can have no decisive influence upon the main question in the case. Is it a duty of the city council, the performance of which can be compelled by writ of mandamus, to appropriate for the use of the fire and police board, the exact sums named in the statement of the board to the mayor? Not one of the powers granted to the board respecting its control of the fire and police departments, its performance of executive functions, and the expenditure of its funds, full, complete and exclusive as the grant is, authorizes it to dictate the amount of the appropriation to be made for its use by the city council. None of the subjects upon which those powers are to be exercised has any relation to the enactment of an appropriation ordinance. Whatever authority the board has in the matter of the appropriation is to be found in section 53 of article 3 of the charter. I have already given a history of the legislation of which that section is the final outcome. As it was originally enacted, it may have contemplated an appropriation by the council of the full amount of the board's estimates. The board presented a statement of the amount necessary to defray its expenses, and a statement of the probable expenses to be incurred, to the city council. It was then the duty of the council, in the annual appropriation ordinance, to provide for the appropriation of sufficient money to defray the expenses incident to, and to be incurred by the board. I do not undertake to con-

strue the language, and it is not necessary that I should. Whatever the intention of the legislature may have been, the section was afterwards amended. The substitution of the mayor for the council for the purpose of receiving the statement is without significance. But the section was further amended by adding words requiring the city council to use the estimates as a basis for the appropriation and conform to them as nearly as the city's finances would permit. It is upon the section as thus amended that the decision of the question now under consideration must turn.

Mandamus lies to compel the performance of a duty purely ministerial in its nature, involving no discretionary right, and not requiring the exercise of judgment; but it does not lie where the performance of the duty is discretionary, or necessitates the exercise of judgment.—High on Extraordinary Remedies, § 24. This principle is fundamental, and I do not understand that it is disputed here. The words added to the original section contemplate a possible condition of the city's finances which would render an appropriation to the fire and police board, of the full amount of its estimates, impracticable, or, at least, unadvisable. The estimated income may not be sufficient to give to each of the several departments of the city government all that it requires; and no appropriation beyond the estimated income can be made. For 1902 the income was estimated at $966,406, and the bill passed by the aldermen appropriated all of it. The amount falls considerably short of the aggregate demands of the different departments, and must be apportioned among them fairly. To use the estimates of the fire and police board as a basis and conform to them as nearly as the city's finances will permit, is simply to give the board such portion of the entire appropriation as would be its share upon a proper

distribution of the insufficient fund among all of the departments.

The charter does not direct the appropriation to the fire and police board of any certain sum. Where the estimated income is insufficient to satisfy all, it requires the appropriation to the board of a sum which, the relative importance of all the departments being duly considered, shall be its just proportion of the whole; and to fairly apportion the fund among the departments so that the appropriation to the board shall conform to its estimates as nearly as the city's finances will permit, demands the exercise of sound and discriminating judgment.

The charter imposes upon the council the duty to enact the annual appropriation ordinance, and performance of that duty may be compelled by mandamus. But where the income is insufficient to satisfy the demands of all the departments, compliance with the law requiring as close a conformity to the estimates of the fire and police board as the condition of the finances will permit, renders the duty to be performed *quasi* judicial in character; and whatever remedy the board may have if, in the appropriation ordinance to be adopted, it fail to receive what it regards as its just proportion of the revenue, that remedy is not mandamus.—*United States v. Seaman,* 17 How. 225; *United States v. Commissioners,* 5 Wall. 563; *Ditch Co. v. Maxwell,* 4 Colo. App. 477.

The demurrer to the alternative writ should have been sustained; but the court, having overruled it, should have carried the demurrer to the answer back to the writ, and adjudged it insufficient.

The judgment is reversed, with instruction to dismiss the proceeding.          *Reversed.*

Gunter, J., concurs.

WILSON, P. J., dissenting.

With great respect for the opinions of my associates, my judgment yet compels me to disagree with their views and dissent from their conclusion upon the main question in this case.

It is a fundamental and controlling rule, recognized by all authorities and having no exception, that in construing doubtful statutes it is the first and paramount duty of courts to ascertain the intent and object of the legislature in its enactment, and to give effect to such intent when so ascertained. It is the intention of the lawmakers that is to be enforced; their intent is the law.—*Rogers v. People,* 9 Colo. 455; *Edwards v. Railroad Co.,* 13 Colo. 59; *County Com'rs v. Hall,* 9 Colo. App. 538; Sutherland on Statutory Construction, § 234; *et seq.;* Endlich on Interpretation of Statutes, § 25, *et seq.* It is also an equally well-settled rule that a statute should be construed as a whole, the general intent being kept in view in determining the scope and meaning of any part. Apparently inconsistent expressions are to be harmonized to reach this general intent. In arriving at the meaning of any one section the entire statute must be considered. If different portions would seem to be conflicting, that construction is to be given which would harmonize them. If a section standing alone admits of two constructions, one of which would harmonize with the entire act and carry out the general intent, and the other would create discord, the former construction should be adopted.—*Livestock Co. v. Godding,* 20 Colo. 71; *Lamborn v. Bell,* 18 Colo. 346; Sutherland, *supra,* § 241; Kent's Commentaries, § 461. In the last cited authority the rule is thus broadly stated by Chancellor Kent:

"In the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms, and its reason and intention will prevail over

the strict letter." By Mr. Sutherland it is said in the section cited, after a consideration of all authorities and the almost  countless adjudications upon the rule: "If upon examination the general meaning and object of the statute be found inconsistent with the literal import of any particular clause or section, such clause or section must, if possible, be construed according to that purpose.  *  *  *  The mere literal construction ought not to prevail if it is opposed to the intention of the legislature apparent from the statute, and if the words are sufficiently flexible to admit of some construction by which that intention can be better effected, the law requires that construction to be adopted."

These rules spring from necessity, one of the principal reasons of them being as stated by a very good authority, that there is "no word in the English language which does not admit of various interpretations." Because of this it has also been well said by another distinguished lawyer and judge that there is nothing so difficult as to construct properly an act of the legislature—a statute—and nothing so easy as to pull it to pieces.

The authorities even go to the extent that words may be entirely rejected as surplusage when a statute would otherwise fail of its object—fail to effect the purpose of the legislative intent, if such intent can be reasonably inferred.—*Simmons v. Powder Works,* 7 Colo. 289; *Edwards v. Railroad Co., supra; U. S. v. Stern,* 5 Blatchford 514.

Prior to 1891 the police department of the city of Denver was under the absolute control and management of the city council, its nominal head being a board consisting of the mayor, the president of each of the two houses of the council and two other members of the city council appointed by the mayor. The legislature of that year made a radical change

whereby the department, as well as the fire department, was placed under the absolute control, charge and management of a board consisting of three members, who were to be appointed by the governor of the state. There can be no two opinions about the intent and object of this statute. It was intended to take from the city council and all of its members, and from the mayor, all power to control and manage these two departments, or to participate in such control or management. It was intended to invest this power in a board which was entirely independent of the city council. This intent clearly appears from the act itself, especially when considered in connection with the statutes theretofore in force, regulating and providing for the control. If further proof were needed, it would be abundantly furnished by a consideration of the current history of public affairs bearing upon the municipal government of Denver, concurrent with and for several years antecedent to this enactment, a consideration which is within the province of the courts and which, indeed, is frequently one of the most effective methods resorted to in order to throw light upon the legislative intent. It is this which most clearly shows the abuse or evil which the legislature intended to reach and to correct.—*City of Dawson v. Waterworks Co.*, 106 Ga. 704; Endlich, *supra,* § 29. In the last cited authority it is said, in announcing the rule as laid down and recognized by the supreme court of the United States, by the courts of England and the highest courts in the states: ''He must refer to the history of the times to ascertain the reason for and the meaning of the provisions of a statute, and to the general state of opinion, public, judicial and legislative, at the time of the enactment. And the unmistakable evidence of such contemporaneous circumstances of the intention of the legislature should govern the construction of the statute whose terms are

left doubtful by the language and whose object is the correction of an abuse.''

It is not necessary for the purposes of this opinion to set forth to any extent the unsavory details of the history to which we have referred as bringing about this enactment. It is sufficient to say that the newspapers of the time teemed with charges of the grossest and most venal corruption in the conduct and management, especially of the police department. It was openly claimed both in the public prints and in public meetings of citizens,—to such an extent, too, that the charges were reiterated and given prominence in the press throughout the state generally,— that the police force of the city under the corrupt system of management then and theretofore prevailing instead of affording protection to the people, was notoriously engaged in defying and defeating the will of the people; that it connived at the lawless intimidation of voters, the stuffing of ballot-boxes, and in fact, the stealing of ballot-boxes; and indeed, it was openly charged that members of the force themselves engaged in these criminal proceedings. It was further charged that bribery was rampant, and that instead of suppressing criminality, some members of the department were in league with the criminal classes, by extending to them protection and freedom from arrest or prosecution. It was indeed charged that the whole city government had become honeycombed with corruption, and that for the purpose of carrying out the nefarious schemes of the cliques and combinations which seemed to control the municipal legislative bodies, the fire and police department was the chief instrument, and that by reason of these alleged facts, this department had become wholly inefficient and incapable of discharging the responsible duties imposed upon it. Whether these charges were true or false, it is unnecessary for the purposes of

this opinion to inquire. It is a matter of judicial history that some of them were preferred and investigated in the courts, with what result it is not here necessary to say. By these reports the people of the city became thoroughly aroused, and there arose a public and pressing demand for relief,—in fact, for the particular relief which was granted by the act of 1891, namely, the divorcement of the fire and police department from the other departments of the city government, and the taking of its control wholly and absolutely from the municipal authorities. It was under these circumstances, influences and surroundings that the eighth general assembly at an early period of its session, passed the act to which we have referred, and passed it by a unanimous vote of both the senate and house of representatives, and with the emergency clause so that it could go into immediate effect. In connection with these circumstances it may and must also be considered that in all cities one of, if not the most important departments of the municipal government is that of the fire and police. Upon it citizens must depend for protection for their lives, persons and property, to secure which is the chief object of municipal organization and government. It must be remembered, too, that Denver was then, as it is now, the largest city in the state, containing more than one-fourth of the population of the entire state, and as large, if not possibly a larger proportion of the entire wealth. There it was especially necessary to have an honest and efficient administration of police affairs, because where are concentrated population and wealth, there flock the criminal classes, —where the prey is, come the vultures,—there they find the green pastures in which to luxuriate and fatten. There is not and cannot be any room for ques-

tion in my opinion as to what the intent of the legis-
lature was by its enactment in 1891, and that it was
such as I have stated.

By the act of 1891, approved March 4, it was
provided that the fire and police board shall, "during
the last quarter of the calendar year present to the
city council of the city of Denver a detailed state-
ment of the money necessary to defray the expenses
of the fire, police and detective departments of the
city for the succeeding year, together with a .state-
ment of the probable expenses to be incurred by said
board; and in the annual appropriation ordinance
for the next calendar year, the city council shall pro-
vide for the appropriation of sums of money suffi-
cient to defray the expenses incident to said depart-
ments and to be incurred by said board." Subse-
quently, and during the same session of the legisla-
ture, this section was amended, and a lenghty section
adopted in lieu of it, providing how money should be
paid out, how pay-rolls certified, regulating the issu-
ance of warrants, etc., and concerning other matters
not embraced in the original section. In the case of
the re-enactment of that portion of the section to
which we have referred, it was provided as in the old
section and in the same language, that the board
should present a detailed statement of the money
necessary to defray expenses, etc., for the succeed-
ing year, and that the city council should provide for
the appropriation of the sums of money sufficient to
defray the expenses incident to and to be incurred
by said board, but there were added the words "using
such estimates as a basis for such appropriation, and
conforming thereto as nearly as the condition of the
city finances will permit." Here arises the trouble
and the occasion of this suit. I cannot give to these
words the construction contended for by the attor-
neys on behalf of the city, and favored by my breth-

ren of this court.   To so hold would in my opinion
utterly subvert, nullify and defeat the entire object
and intent of the legislature.   The fire and police de-
partment could not of course be conducted without the
expenditure of large sums of money to be derived
from taxation.   It needs no argument to convince
any reasonable person that if the purse-strings were
to be placed in control of the city council, that if the
unrestricted power to fix the amount of money to be
used by the fire and police departments, to say
whether it should be large or small, should be vested
in that body, from whose corrupt control and man-
agement the legislature was seeking to wrest the fire
and police board, then the whole purpose of the act
would be defeated.   The board instead of being
wholly independent of, would be absolutely depend-
ent upon the city council.   In such case it is too pat-
ent to require argument that there would be placed
in the hands of the council a powerful weapon by the
skillful use of which it could coerce and control the
board.   It could dictate the number and personnel of
the force and the action of the board, or in case of
refusal leave them without adequate funds to dis-
charge the duties imposed for the public protection.
In either case the main and only object of the statute
would be nullified.   Such a construction would ob-
viously lead to an absurdity, and would be plainly
and utterly inconsistent with the manifest and para-
mount legislative intent.   In such case it is the duty
of the court under the undisputed rule which I have
cited, to consider the act as a whole, and endeavor to
harmonize all of its provisions with the intent, and
give to these words a construction, if possible, in har-
mony with the remainder of the statute.   In my opin-
ion, the fire and police board, and it only, is clearly
vested with the power to determine what would be
necessary and sufficient to defray its expenses for the

current year, and the words with reference to the appropriation by the city council, "and conforming thereto as nearly as the condition of the city finances will permit," do not divest the board of this power. These words, if they mean anything in a restrictive or supervisory sense, simply authorize the city council to change this estimate only in case it appeared that the amount of the estimate, added to the salaries of officers and other specific charges fixed by the statute and required to be paid, should exceed the probable amount of revenue to be collected through the year. This is concededly not the case here. In other words, to make it plainer, my opinion is that it would be the duty of the city council in making its annual appropriation bill, to first ascertain the amount of the salaries of officers, and other fixed charges specifically required by the statute to be paid, and then to add to that the estimate or requisition of the fire and police board; and if the total did not exceed the total probable amount of revenue, it would be its duty to make the appropriation for the board in the precise sum stated in its estimate. This construction would give effect to every part and portion of the statute and would harmonize with its unquestioned intent and object, whilst the other construction would defeat it. If I am correct in this conclusion, it will of course be manifest that the city council had only a fixed and definite duty to perform, and that hence mandamus would lie.

There is nothing unreasonable in investing the fire and police board with the exclusive and sole power to say what sum of money should be required for the proper exercise of its duties. All municipal power is derived solely from the legislature, and a municipality can exercise no power except that expressly granted or necessarily implied. The legislature if it desired, and it frequently does, could con-

fer upon any department of the municipal government—indeed, upon any official—any special privileges or powers which it might see fit, or impose upon it specific duties and responsibilities which the general legislative body of the municipality could in no respect change. Why should it be more improper for the board than for the city council to say what amount of money they must have for the duties imposed upon them? The board has sole charge of the dispensing of the money, and by reason of its having exclusive control of the department, it has a knowledge of its needs and necessities which the city council does not and cannot from the very nature of the thing, have. It is said, however, that if the board was invested with this absolute power, it might fix such a large sum that there would be nothing left for other departments of the city. This is possible. It may be said also that if the city council has the power contended for by appellants, it might appropriate for the use of the department a sum so manifestly insufficient and inadequate that it would be impossible to render the services required by statute and the people would be denied that protection which they are entitled to have. Power in either case might be abused, but for an unwarranted and arbitrary abuse I imagine that in either case the same remedy would lie,—namely, an appeal to the courts.

My conclusion as to the construction of the disputed section is in my opinion strongly supported by two recent decisions of this court.—*Board of Public Works v. Hayden,* 13 Colo. App. 36; *McMurray v. Hayden,* 13 Colo. App. 53. The latter case came up on the question of the refusal of the mayor to approve an estimate of the board of public works for some street improvements. The charter provided that payments for such improvements should be made in bonds or warrants, as the case might be, issued by

the city treasurer upon estimates and orders of the
board of public works, approved by the mayor.   The
bonds could not issue until the estimate of the board
had received such approval.   The court held, and
rightly, too, in my opinion, that this power of ap-
proval vested in the mayor was not discretionary, that
it was purely ministerial and that the charter made
it mandatory upon him when the estimate of the
board was presented.   This conclusion was based up-
on the fact only that the board of public works is
vested with exclusive authority in all matters con-
nected with improvements.   They furnish the speci-
fications for the work, direct it while in progress, and
that it is their duty to see that it is done in accord-
ance with the specifications; that they receive no ad-
vice from the mayor, and nothing is left to his judg-
ment; that they constitute the sole tribunal to pass
upon the question of the fulfillment by the contractor
of his undertaking, and that the estimate which they
issue is their judgment that the work has been prop-
erly performed, and that a certain amount is due;
and so far as the mayor is concerned, that judgment
is final.   I cannot conceive why these reasons are not
equally applicable to the present case.   The fire and
police board, equally with the board of public works,
has supreme power within the scope of its duty as
defined by the charter, and neither the mayor nor the
city council has any discretion in reference to it.   To
approve in its ordinary acceptation as used in refer-
ence to the acts of public officers, means, and it is so
defined by Webster, to sanction officially, to ratify, to
confirm.   Where this power is vested in an officer
there is necessarily implied according to the general
understanding and usage of the word, the exercise of
judgment and discretion and the power to withhold
approval and to disapprove.   To approve one must
or at least should, believe the thing to be right and

proper. Anderson in his Law Dictionary gives as definitions, to accept as good or sufficient for the purpose intended, to affirm as lawful and proper, to concur in the propriety or expediency, the legality or constitutionality of, to give executive sanction to, etc. By no authority within my knowledge is it defined so as to exclude in the exercise of the power, the right of the person to whom the matter is submitted for approval, to use judgment and discretion and to disapprove if desired. In that case we held, and properly too, that the word "approval" did not mean approval at all; that practically and in effect as there used it meant only signature or endorsement. And why? Because "the board of public works is vested with exclusive authority in all matters connected with the improvements." To have held otherwise would have resulted in giving the mayor the power to have participated in or influenced this control and management thereby tending to defeat the express object, purpose and intent of the statute—that same statute which aimed to give to the fire and police board the exclusive control and management of all matters pertaining to the fire and police departments. To uphold the act and carry out the purpose of its enactment, we were compelled to give to the word "approval" a meaning which it never had either in usage or according to the lexicographers. Under that decision the mayor is required "to approve," however much he may disapprove, and even though he may have a well-grounded belief that he is assisting in the perpetration of a wrong. If the duty of the mayor to approve the estimates of the board of public works is "purely ministerial," it being so held to give effect to the intent and purpose of the act creating the board of public works and defining its duties, I cannot see why under similar conditions and for like reasons it should not be held to be equally mandatory

upon the city council to appropriate for the use of the fire and police departments the amount found by that board to be necessary and specified in its estimate.

Even granting the construction contended for by appellants it cannot be said that the city council was in terms or by implication given any power to inquire into the needs and necessities of the fire and police department. This would be an absurd conclusion because, being divested of all power and control over the department they would not be in a position to know anything about its needs or necessities. The only discretion that the city council could have in any event would be to determine whether the condition of the city finances would permit the appropriation of the amount demanded, not whether in the opinion or judgment of the council the condition of the city finances would permit. This involved merely the ascertaining of a condition, which could be determined simply by an arithmetical computation or calculation. It involved no element of judgment or discretion, as it must exist in order to defeat mandamus. After the estimate of the fire and police board was presented all that remained for the city council to do was to compute what the probable amount of revenue derived from taxation during the current year would be, which could be readily ascertained, the amount of the levy having been fixed and the valuation of the assessable property known, and then ascertain whether the amount required by the board, added to the amount of salaries, etc., which the city was compelled by the charter to pay, would exceed the amount of the receipts.—*Manor v. McCall,* 5 Ga. 525; *Arberry v. Beavers,* 6 Tex. 464.

Another question has been presented and argued, and may be at least referred to even though not discussed in the majority opinion. Conceding that mandamus will not lie to control discretion and judgment,

there are cases in which it may lie to control an abuse of discretion if the cases are otherwise proper.—*Wood v. Strother,* 76 Calif. 549.

See note to *Weeden v. Town Council of Richmond,* 98 Am. Dec. 375. In this case it cannot be gainsaid that there was a gross abuse of discretion on the part of the city council. Without waiting to receive proper notices from the officers designated by law and upon notice from whom alone the council was permitted by law to act, as to the amount of the assessed valuation of property within the city limits, and without waiting to receive from the fire and police board or requesting it to present an estimate of the amount of money which the necessities of that department would require during the coming year, long before the expiration of the time in which the council was required to fix the rate of the tax levy and before the time when such rate was usually fixed, without therefore having information as to what amount of money would be required for the proper administration of the affairs of the city government during the coming year, it hurriedly fixed the tax rate and at a figure much less than the amount the law would have permitted it to fix. If it had levied a slightly greater rate there would have been ample funds to have satisfied all of the requirements of the fire and police board as well as the needs of other departments of the city government according to the estimate of the mayor and the council. Can a city council be thus permitted to evade its duty even though it be conceded to have some discretion in the premises? Can it rely upon a condition improperly and improvidently brought about by its own act to defeat a writ of mandate which alone could furnish an adequate remedy? The condition of the city finances would have permitted an appropriation of the full amount required by the fire and police board if the council

had fixed a higher rate of tax levy, which it could have done and still have kept within the taxing limits prescribed by charter. Can it now turn around and defeat the application for and issuance of a writ of mandate by pleading its own willful failure and dereliction of duty? To so hold would be a travesty upon law.—*Lexington .v. Board of Education* (Ky. Court of Appeals), 65 S. W. 828.

I do not, however, feel it necessary to discuss at length the effect of these acts of omission and commission nor their bearing upon the question of the issuance of a writ of mandamus, because my conclusion is that the city council had no judgment or discretion in the premises; that the power vested in it by the statute was purely ministerial, and that the duty upon it to make the appropriation required by the estimate of the fire and police board was mandatory.

To one who has been an observer of, or is conversant with the history of municipal government in the United States it is a fact well known that it has been and is the most serious problem of the age. To its solution the most eminent publicists and profound thinkers have devoted much study to devise a system and impose such restrictions as would correct abuses and stamp out corruption. It has been a herculean task and thus far the experiments tried have not been attended with complete success. If current public history is to be believed the advancement in ingenuity and fertility of expedients to evade laws of those who profit by municipal frauds seems to more than keep pace with the progress of those who honestly seek reform. It is also generally known that in all the various branches and departments of city government that of the police has furnished one of the most fruitful fields for such abuse and corruption. There always have been such abuses and in view of

the past I am not optimist enough to believe that the time will ever arrive when they will entirely cease. I do believe, however, that to statutes enacted by the legislature in the laudable attempt to at least minimize these abuses public policy and the public good require, and hence also not only the law of reason but the law of the land as pronounced by the highest authorities, a liberal construction to be given to effectuate the ends proposed, and that their intent, object and purpose should not be frittered away, dissipated and entirely defeated by a stringent or doubtful interpretation. It is my opinion that the conclusions of the trial judge were correct and in accordance with law, and that his judgment should be affirmed.