Wilson, P. J.,
dissenting.
With great respect for the opinions of my associates, my judgment yet compels me to disagree with their views and dissent from their conclusion upon the main question in this case.
It is a fundamental and controlling rule, recognized by all authorities and having no exception, that in construing doubtful statutes it is the first and paramount duty of courts to ascertain the intent and object of the legislature in its enactment, and to give effect to such intent when so ascertained. It is the intention of the lawmakers that is to be enforced; their intent is the law.—Rogers v. People, 9 Colo. 455; Edwards v. Railroad Co., 13 Colo. 59; County Com’rs v. Hall, 9 Colo. App. 538; Sutherland .on Statutory Construction, § 234; et seq.; Endlich on Interpretation of Statutes, § 25, et seq. It is also an equally well-settled rule that a statute should be construed as a whole, the general intent being kept in view in determining the scope and meaning of any part. Apparently inconsistent expressions are to be harmonized to reach this general intent. In arriving at the meaning of any one section the entire statute must be considered. If different portions would seem to be conflicting, that construction is to be given which would harmonize them. If a section standing alone admits of two constructions, one of which would harmonize with the entire act and carry out the general intent, and the other would create discord, the former construction should be adopted.—Livestock Co. v. Godding, 20 Colo. 71; Lamborn v. Bell, 18 Colo. 346; Sutherland, supra, § 241; Kent’s Commentaries, § 461. In the last cited authority the rule is thus broadly stated by Chancellor Kent:
' “In the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms, and its reason and intention will prevail over. *394 the strict letter.” By Mr. Sutherland it is said in the section cited, after a consideration of all authorities and the almost countless adjudications upon the rule: “If upon examination the general meaning and object of the statute be found inconsistent with the literal import of any particular clause or section, such clause or section must, if possible, be construed according to that purpose. * * * The mere literal construction ought not to prevail if it is opposed to the intention of the legislature apparent from the statute, and if the words are sufficiently flexible to admit of some construction by which that intention can be better effected, the law requires that construction to be adopted.”
These rules spring from necessity, one of the principal reasons of them being as stated by a very good authority, that there is “no word in the English language which does not admit of various interpretations.” Because of this it has also been well said by another distinguished lawyer and judge that there is nothing so difficult as to construct properly an act of the legislature — a statute — and nothing so easy as to pull it to pieces.
The authorities even go to the extent that words may be entirely rejected as surplusage when a statute would otherwise fail of its object — fail to effect the purpose of the legislative intent, if such intent can be reasonably inferred.—Simmons v. Powder Works, 7 Colo. 289; Edwards v. Railroad Co., supra; U. S. v. Stern, 5 Blatchford 514.
Prior to 1891 the police department of the city of Denver was under the absolute control and management of the city council, its nominal head being a board consisting of the mayor, the president of each of the two houses of the council and two other members of-the city council appointed by the mayor. The legislature, of that year made a radical change *395 whereby the department, as well as the fire department, was placed under the absolute control, charge and management of a board consisting of three members, who were to be appointed by the governor of the state. There can be no two opinions about the intent and. object of this statute. It was intended to take from the city council and all of its members, and from the mayor, all power to control and manage these two departments, or to participate in such control or management. It was intended to invest this power in a board which was entirely independent of the city council. This intent clearly appears from the act itself, especially when considered in connection with the statutes theretofore in force, regulating and providing for the control. If further proof were needed, it would be abundantly furnished by a consideration of the current history of public affairs bearing upon the municipal government of Denver, concurrent with and for several years antecedent to this enactment, a consideration which is within the province of the courts and which, indeed, is frequently one of the most effective methods resorted to in order to throw light upon the legislative intent. It is this which most clearly shows the abuse or evil which the legislature intended to reach and to correct.—City of Dawson v. Waterworks Co., 106 Ga. 704; Endlich, supra, §29. In the last cited authority it is said, in announcing the rule as laid down and recognized by the supreme court of the United States, by the courts of England and the highest courts in the states: “He must refer to the history of the times to ascertain the reason for and the meaning of the provisions of a statute, and to the general state of opinion, public, judicial and legislative, at the time of the enactment. And the unmistakable evidence of such contemporaneous circumstances of the intention of the legislature should govern the construction of the statute whose terms are *396 left doubtful by the language and whose object is the correction of an abuse. ’ ’
It is not necessary for the purposes of this opinion to set forth to any extent the unsavory details of the history to which we have referred as bringing about this enactment. It is sufficient to say that the newspapers of the time teemed with charges of the grossest and most venal corruption in the conduct and management, especially of the police department. It was openly claimed both in the public prints and in public meetings of citizens, — to such an extent, too, that the charges were reiterated and given prominence in the press throughout the state generally,— that the police force of the city under the corrupt system of management then and theretofore prevailing instead of affording protection to the people, was notoriously engaged in defying and defeating the will of the people; that it connived at the lawless intimidation of voters, the stuffing of ballot-boxes, and in fact, the stealing of ballot-boxes; and indeed, it was openly charged that members of the force themselves engaged in these criminal proceedings. It was further charged that bribery was rampant, and that instead of suppressing criminality, some members of the department were in league with the criminal classes, by extending to them protection and freedom from arrest or prosecution. It was indeed charged that the whole city government had become honeycombed with corruption, and that for the purpose of carrying out the nefarious schemes of the cliques and combinations which seemed to control the municipal legislative bodies, the fire and police department was the chief instrument, and that by reason of these alleged facts, this department had become wholly inefficient and incapable of discharging the responsible duties imposed upon it. Whether these charges were true or false, it is unnecessary for the purposes of *397 this opinion to inquire. It is a matter of judicial history that some of them were preferred and investigated in the courts, with what result it is not here necessary to say. By these reports the people of the city became thoroughly aroused, and there arose a public and pressing demand for relief, — in fact, for the particular relief which was granted by the act of 1891, namely, the divorcement of the fire and police department from the other departments of the city government, and the taking of its control wholly and absolutely from the municipal authorities. It was under these circumstances, influences and surroundings that the eighth general assembly at an early period of its session, passed the act to which we have referred, and passed it by a unanimous vote of both the senate and house of representatives, and with the emergency clause so that it could go into immediate effect. In connection with these circumstances it may and must also be considered that in all cities one of, if not the most important departments of the municipal government is that of the fire and police. Upon it citizens must depend for protection for their lives, persons and property, to secure which is the chief object of municipal organization and government. It must be remembered, too, that- Denver was then, as it is now, the largest city in the state, containing more than one-fourth of the population of the entire state, and as large, if not possibly a larger proportion of the entire wealth. There it was especially necessary to have an honest and efficient administration of police affairs, because where are concentrated population and wealth, there flock the criminal classes, —where the prey is, come the vultures, — there they find the green pastures in which to luxuriate and fatten. There is not and cannot be any room for ques *398 tion in my opinion as to what the intent of the legislature was by its enactment in 1891, and that it was such as I have stated.
By the act of 1891, approved March 4, it was provided that the fire and police board shall, ‘ ‘ during the last quarter of the calendar year pi’esent to the city council of the city of Denver a detailed statement of the money necessary to defray the expenses of the fire, police and detective departments of the city for the succeeding year, together with a.statement of the probable expenses to be incurred by said board; and in the annual appropriation ordinance for the next calendar year, the city council shall provide for the appropriation of sums of money sufficient to defray the expenses incident to said departments and to be incurred by said board.” Subsequently, and during the same session of the legislature, this section was amended, and a. lenghty section adopted in lieu of it, providing how money should be paid out, how pay-rolls certified, regulating the issuance of warrants, etc., and concerning other matters not embraced in the original section. In the case of the re-enactment of that portion of the section to which we have referred, it was provided as in the old section and in the same language, that the board should present a detailed statement of the money necessary to defray expenses, etc., for the succeeding year, and that the city council should provide for the appropriation of the sums of money sufficient to defray the expenses incident to and to be incurred by said board, but there were added the words “using such estimates as a. basis for such appropriation, and conforming thereto as nearly as the condition of the city finances will permit.” Here arises the trouble and the occasion of this suit. I cannot give to these words the construction contended for by the attorneys on behalf of the city, and favored by my breth *399 ren of this court. To so hold would in my opinion utterly subvert, nullify and defeat the entire object and intent of the legislature. The fire and police department could not of course be conducted without the expenditure of large sums of money to be derived from taxation. It needs no argument to convince any reasonable person that if the purse-strings were to be placed in control of the city council, that if the unrestricted power to fix the amount of money to be used by the fire and police departments, to say whether it should be large or small, should be vested in that body, from whose corrupt control and management the legislature was seeking to wrest the fire and police board, then the whole purpose of the act would be defeated. The board instead of being wholly independent of, would be absolutely dependent upon the city council. In such case it is too patent to require argument that there would be placed in the hands of the council a powerful weapon by the skillful use of which it could coerce and control the board. It could dictate the number and personnel of the force and the action of the board, or in case of refusal leave them without adequate funds to discharge the duties imposed for.the public protection. In either case the main and only object of the statute would be nullified. Such a construction would obviously lead to an absurdity, and would.be plainly •and utterly inconsistent with the manifest and paramount legislative intent. In such case it is the duty of the court under the undisputed .rule which I have cited, to consider the act as a whole, and endeavor to harmonize all of its provisions with the intent, and give to’ these words a construction, if possible, in harmony with the remainder of the statute. In my opinion, the fire and police board, and it only, is clearly vested with the power to determine what would be necessary and sufficient to defray its expenses for the *400 current year, and the words with reference to the appropriation by the city council, “and conforming thereto as nearly as the condition of the city finances will permit,” do not divest the board of this power. These words, if they mean anything in a restrictive or supervisory sense, simply authorize the city council to change this estimate only in ease it appeared that the amount of the estimate, added to the salaries of officers and other specific charges fixed by the statute and required to be paid, should exceed the probable amount of revenue to be collected through the year. This is concededly not the case here. In other words, to make it plainer, my opinion is that it would be the duty of the city council in making its annual appropriation bill, to first ascertain the amount of the salaries of officers, and other fixed charges specifically required by the statute to be paid, and then to add to that the estimate or requisition of the fire and police board; and if the total did not exceed the total probable amount of revenue, it would be its duty to make the appropriation for the board in the precise sum stated in its estimate. This construction would give effect to every part and portion of the statute and would harmonize with its unquestioned intent and object, whilst the other construction would defeat it. If I am correct in this conclusion, it will of course be manifest that the city council had only a fixed and definite duty to perform, and that hence mandamus would lie. ’
There is nothing unreasonable in investing the fire and police board with the exclusive and sole power to say what sum of money should be required for the proper exercise of its duties. All municipal power is derived solely from the legislature, and a municipality can exercise no power except that expressly granted or necessarily implied. The legislature if it desired, and it frequently does, could con *401 fer upon any department of the municipal government — indeed, upon any official — any special privileges, or powers which it might see fit, or impose upon it specific duties and responsibilities which the general legislative body of the municipality could in no respect change. Why should it be more improper for the board than for the city council to say what amount of money they must have for the duties imposed upon them? The board has sole charge of the dispensing of the money, and by reason of its having exclusive control of the department, it has a knowledge of its needs and necessities which the city council does not and cannot from the very nature of the thing, have. It is said, however, that if the board was invested with this absolute power, it might fix such a large sum that there would be nothing left for other departments of the city. This is possible. It may be said also that if the city council has the power contended for by appellants, it might appropriate for the use of the department a sum so manifestly insufficient and inadequate that it would be impossible to render the services required by statute and the people would be denied that protection which they are entitled to have. Power in either case might be abused, but for an unwarranted and arbitrary abuse I imagine that in either case the same remedy would lie, — namely, an appeal to the courts.
My conclusion as to the construction of the disputed section is in my opinion strongly supported by two recent decisions of this court.—Board of Public Works v. Hayden, 13 Colo. App. 36; McMurray v. Hayden, 13 Colo. App. 53. The latter case came up on the question of the refusal of the mayor to approve an estimate of the board of public works for some street improvements. The charter provided that payments for such improvements should be made in bonds or warrants, as the case might be, issued by *402 the city treasurer upon estimates and orders of the board of public works, approved by the mayor. The bonds could not issue until the estimate of the board had received such approval. The court held, and rightly, too, in my opinion, that this power of approval vested in the mayor was not discretionary, that it was purely ministerial and that the charter made it mandatory upon him when the estimate of the board was presented. This conclusion was based upon the fact only that the board of public works is vested with exclusive authority in all matters connected with improvements. They furnish the specifications for the work, direct it while in progress, and that it is their duty to see that it is done in accordance with the specifications; that they receive no advice from the mayor, and nothing is left to his judgment; that they constitute the sole tribunal to pass upon the question of the fulfillment by the contractor of his undertaking, and that the estimate which they issue is their judgment that the work has been properly performed, and that a certain amount is due; and so far as the mayor is concerned, that judgment is final. I cannot conceive why these reasons are not equally applicable to the present ease. The fire and police board, equally with the board of public works, has supreme power within the scope of its duty as defined by the charter, and neither the mayor nor the city council has any discretion in reference to it. To approve in its ordinary acceptation as used in reference to the acts of public officers, means, and it is so defined'by Webster, to sanction officially, to ratify, to confirm. Where this power is vested in an officer theré is necessarily implied according to the general understanding and usage of the word, the exercise of judgment and discretion and the power to withhold approval and to disapprove. To approve one must or at least should, believe the thing to be right and *403 proper. Anderson in Ms Law Dictionary gives as definitions, to accept as good or sufficient for the purpose intended, to affirm as lawful and proper, to concur in the propriety or expediency, the legality or constitutionality of, to give executive sanction to, etc. By no authority within my knowledge is it defined so as to exclude in the exercise of the power, the right of the person to whom the matter is submitted for approval, to use judgment and discretion and to disapprove if desired. In that case we held, and properly too, that the word “approval” did not mean approval at all; that practically and in effect as there used it meant only signature or endorsement. And why? Because “the board of public works is vested with exclusive authority in all matters connected with the improvements.” To have held otherwise would have resulted in giving the mayor the power to have participated in or influenced this control and management thereby tending to defeat the express object, purpose and intent of the statute — that same statute which aimed to give to the fire and police board the exclusive control and management of all matters pertaining to the fire and police departments. To uphold the act and carry out the purpose of its enactment, we were compelled to give to the word “approval” a meaning which it never had either in usage or according to the lexicographers. Under that decision the mayor is required “to approve,” however much he may disapprove, and even though he may have a well-grounded belief that he is assisting in the perpetration of a wrong. If the duty of the mayor to approve the estimates of the hoard of public works is ‘ ‘ purely ministerial, ’ ’ it being so held to give effect to the intent and purpose of the act creating the board of public works and defining its duties, I cannot see why under similar conditions and for like reasons it should not be held to he equally mandatory *404 upon the city council to appropriate for the use of the fire and police departments the amount found by that board to be necessary and specified in its estimate.
Even granting the construction contended for by appellants it cannot be said that the city council was in terms or by implication given any power to inquire into the needs and necessities of the fire and police department. This would be an absurd conclusion because, being divested of all power and control of er the department they would not be in a position to know anything about its needs or necessities. The only discretion that the city council could have in any event would be to determine whether the condition of the city finances would permit the appropriation of the amount demanded, not whether in the opinion or judgment of the council the condition of the city finances would permit. This involved merely the ascertaining of a condition, ,which could be determined simply by an arithmetical computation or calculation. It involved no element of judgment or discretion, as it must exist in order to defeat mandamus. After the estimate of the fire and police board was presented all that remained for the city council to do was to compute what the probable amount of revenue derived from taxation during the current year would be, which could be readily ascertained, the amount of the levy having been fixed and the valuation of the assessable property known, and then ascertain whether the amount required by the board, added to the amount of salaries, etc., which the city was compelled by the charter to pay, would exceed the amount of the receipts.—Manor v. McCall, 5 Ga. 525; Arberry v. Beavers, 6 Tex. 464.
Another question has been presented and argued, and may be at least referred to even though not discussed in the majority opinion. Conceding that mandamus will not lie to control discretion and judgment, *405 there are eases in which it may lie to control an abnse of discretion if the cases are otherwise proper.—Wood v. Strother, 76 Calif. 549.
See note to Weeden v. Town Council of Richmond, 98 Am. Dec. 375. In this case it cannot be gainsaid that there was a gross abuse of discretion on the part of the city council. Without waiting to receive proper notices from the officers designated by law and upon notice from whom alone the council was permitted by law to act, as to the amount of the assessed valuation of property within the city limits, and without waiting to receive from the fire and police board or requesting it to present an estimate of the amount of money which the necessities of that department would require during the coming year, long before the expiration of the time in which the council was required to fix the rate of the tax levy and before the time when such rate was usually fixed, without therefore having information as to what amount of money would be required for the proper administration of the affairs of the city government during the coming year, it hurriedly fixed the tax rate and at a figure much less than the amount the law would have permitted it to fix. If it had levied a slightly greater rate there would have been ample funds to have satisfied all of the requirements of the fire and police board as well as the needs of other departments of the city government according to the estimate of the mayor and the council. Can a city council be thus permitted to evade its duty even though it be conceded to have some discretion in the premises ? Can it rely upon a condition improperly and improvidently brought about by its own act to defeat a writ of mandate which alone could furnish an adequate remedy? The condition of the city finances would have permitted an appropriation of the full amount required by the fire and police board if the council *406 had fixed a higher rate of tax levy, which it could have done and still have kept within the taxing limits prescribed by charter. Can it now turn around and defeat the application for and issuance of a writ of mandate by pleading its own willful failure and dereliction of duty? To so hold would be a travesty upon law.—Lexington v. Board of Education (Ky. Court of Appeals), 65 S. W. 828.
I do not, however, feel it necessary to discuss at length the effect of these acts of omission and commission nor their bearing upon the question of the issuance of a writ of mandamus, because my conclusion is that the city council had no judgment or discretion in the premises; that the power vested in it by the statute was purely ministerial, and that the duty .upon it to make the appropriation required by the estimate of the fire and police board was mandatory.
To one who has been an observer of, or is conversant with the history of municipal government in the United States it is a fact well known that it has been and is the most serious problem of the age. To its solution the most eminent publicists and profound thinkers have devoted much study to devise a system and impose such restrictions as would correct abuses and stamp out corruption. It has been a herculean task and thus far the experiments tried have not been attended with complete success. If current public history is to be believed the advancement in ingenuity and fertility of expedients to evade laws of those who profit by municipal frauds seems to more than keep pace with the progress of those who honestly seek reform. It is also generally known that in all the various branches and departments of city government that of the police has furnished one of the most fruitful fields for such abuse and corruption. There always have been such abuses and in view of *407 the past I am not optimist enough to believe that the time will ever arrive when they will entirely cease. I do believe, however, that to statutes enacted by the legislature in the laudable attempt to at least minimize these abuses public policy and the public good require, and hence also not only the law of reason but the law of the land as pronounced by the highest authorities, a liberal construction to be given to effectuáte the ends proposed, and that their intent, object and purpose should not be frittered away, dissipated and entirely defeated by a stringent or doubtful interpretation. It is my opinion that the conclusions of the trial judge were correct and in accordance with law, and that his judgment should be affirmed.